

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

**NOS. PD-0326-13 & PD-0327-13**

**DIETER HEINZ WERNER, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FIRST COURT OF APPEALS
HARRIS COUNTY**

**COCHRAN, J., delivered the opinion of the unanimous Court.**

O P I N I O N

In two separate indictments, appellant was charged with stalking his former girlfriend.[1] Before trial, the judge permitted the State to consolidate the offenses and denied appellant's motion to sever. The jury convicted appellant of both offenses, and the trial judge assessed punishment at ten years' confinement for each offense, to run concurrently. On appeal, appellant argued that the trial judge erred by denying his motion to sever. The court

---

[1] *See* TEX. PENAL CODE § 42.072(a).

of appeals agreed, holding that appellant had an absolute right to sever under Section 3.04 of the Texas Penal Code. Finding the error harmful, the court of appeals reversed appellant's conviction and ordered a new trial.[2]

We granted the State Prosecuting Attorney's (SPA's) petition to decide if denying a severance motion is harmful error when the evidence of guilt is overwhelming for the first offense and evidence of that first offense would have been admissible in a trial of the second offense.[3] Because the State was entitled to offer evidence of appellant's prior acts of harassment relevant to the first stalking offense to prove the elements of the second stalking offense, we conclude that the error was harmless under TEX. R. APP. P. 44.2(b).

## I.

The first indictment alleged that appellant stalked his ex-girlfriend, D.D., during March and April 2010; the second alleged that appellant stalked her on July 13, 14, and 16, 2010. The prosecutor moved to consolidate the two cases for a single trial. Appellant then filed a motion to sever the April stalking charge from the July one. At a pre-trial hearing, the prosecutor argued that proceeding with a single trial would promote judicial economy because the State planned to offer evidence of both offenses to establish its case-in-chief.

---

[2] *Werner v. State*, Nos. 01–11–00464–CR, 01–11–00465–CR, 2013 WL 824040 (Tex. App.—Houston [1st Dist.] Feb. 21, 2013) (not designated for publication).

[3] The State's grounds for review are as follows:
(1)     Is error in failing to sever offenses that are inextricably intertwined harmful when evidence of one would be admissible to prove the other if they were tried separately?
(2)     Is error in failing to sever offenses harmful as to an offense for which the evidence of guilt is overwhelming?

The prosecutor explained that Rule 404(b) allows the State to offer evidence of a common intent and a continuing course of conduct, and she stated that both stalking incidents involved the use of GPS tracking devices and harassing text messages. Appellant said that trying two incidents "involv[ing] different fact patterns and different time periods" together would prejudice the jury against him. The trial judge denied appellant's motion to sever, stating that consolidation "would not unduly prejudice the defendant" because the evidence of appellant's course of conduct would be admissible to prove his intent.

The evidence at trial showed that appellant and D.D. had an on-again, off-again relationship for over a year until appellant ended the relationship because they did not have sex frequently enough. In October 2009, several months prior to the break-up, appellant began text messaging D.D., asking about her whereabouts and activities. D.D. thought little of it at first, but eventually grew to harbor nagging doubts about his questioning.

Appellant continued to communicate with D.D. after their break-up in January 2010, messaging her repeatedly if she failed to reply to his texts. D.D.'s suspicions grew as appellant's messages showed an inexplicable familiarity with her and her family's whereabouts. For example, in January of 2010, D.D.'s grandmother became ill, and D.D., planning to spend the night with her in the I.C.U., asked the mother of her daughter's boyfriend if her daughter could spend the night at their house. Appellant texted D.D. throughout the night while she was at the I.C.U. He was upset because D.D. was to have met him that night for drinks. The next morning, appellant called D.D. and told her that her

daughter had spent the night with her boyfriend. D.D. had known that, of course, but she was worried about how appellant would know her daughter's whereabouts. He sent D.D. more text messages that month, warning her that he was going to send letters to D.D.'s mother and grandmother telling them that D.D.'s daughter had spent the night at her boyfriend's house. He did send the letters and wrote that he didn't approve. He also wrote them about how D.D., her daughter, and the boyfriend had gone to San Antonio for a "cheer competition." D.D. was afraid that appellant "could go after my daughter" and hurt her, as well as D.D.

D.D.'s concerns came to a head in March when she went to the Houston rodeo and saw Sgt. Montemayor, an old friend of hers, who was a Sheriff's officer. D.D. had just received a text message from appellant saying, "I think you should go to the rodeo." D.D. looked "frazzled" and "unnerved," and she "threw a fit" to make Sgt. Montemayor check for a tracking device on her car. Sgt. Montemayor checked her car just to humor D.D. and was very surprised to find a tracking device under the passenger's side back bumper.[4] He told D.D. to file an official report, but she didn't because she couldn't prove that appellant had put the device there. She knew that appellant would be really mad if she accused him, but couldn't prove it.

She kept the tracking device, but it seemed that appellant was still tracking her:

> He continued to text-message D.D., "harassing her" and frequently identifying her whereabouts and describing her recent movements.

---

[4] Sgt. Montemayor said that it is a Class A misdemeanor to put a tracking device on someone's car without their permission unless it is placed there by law enforcement under authority of a warrant.

He sent text messages saying, "Pissed me off when I saw you at Kroger and you turned your head. I would never treat you like that," and "Should have answered the phone and not ignore me again. Pissed me off. Now I show you. Prema D."[5]

On another occasion, appellant texted D.D. that he knew she had parked in a Dairy Queen parking lot for several hours; indeed, D.D. had parked there while she visited her aunt, who lived behind the Dairy Queen.

On April 15th, D.D.'s daughter and her girlfriend went to the movies in D.D.'s car. When they came out of the theater, they found that three of the car's tires[6] had been slashed by someone who looked like appellant and who had left in a car that matched appellant's car. D.D. was really worried because "[i]t was a predator's dream, two little girls in the movies."

Police discovered a second tracking device on D.D.'s car (in the very same place as the first one) when they investigated the tire-slashing incident.

Other evidence showed that appellant had purchased tracking devices on October 1, 2009; March 6, 2010; and March 12, 2010. He had a monthly subscription to a service that informed him of the trackers' location every ten seconds, and the tracking history for those devices corresponded with D.D.'s self-reported activities and appellant's text messages.

Following these incidents, appellant was indicted for stalking, and, on May 16th, a magistrate issued a sixty-day emergency restraining order, prohibiting appellant from coming within 200 feet of D.D., her workplace, or her residence. While the order was in effect, D.D. saw appellant drive past her home on two occasions in July, but he did not call or text her.

---

[5] D.D. thought that appellant meant to say that she was a "prima donna."

[6] D.D. explained that she was not surprised that three tires were slashed because "the first time" two tires on her grandmother's Explorer had been slashed, but it had been "an easy fix." This time her car had to be carried away on a flatbed truck.

Her daughter also saw appellant drive by a spot where she had just dropped off D.D.

On July 16, the day after the restraining order expired, D.D. drove to her bank ATM and saw appellant's car parked at a defunct drive-through window nearby. D.D. was afraid that "he was coming after [her]." D.D. went across the street to the Valero gas station and found two police officers inside. She was "panicked" and "very emotional" when she talked to Officer Werner (no relation to appellant). She told him that she had a protective order and that the "stalker" was outside. She gave the officers a copy of her protective order.

Officer Werner drove across the street, approached appellant, and asked him why he was parked by the drive-through. Appellant gave the officer several inconsistent responses: He claimed that he was waiting for a Home Depot to open, even though it already was; he said he was getting gas, even though he had a full tank; he stated that he was getting a cappuccino from the gas station, even though he was parked across the street; and he asserted that he had parked briefly to jot down a note, even though none was to be found. Thinking that the protective order was still in effect and believing that appellant had violated that order, Officer Werner arrested him. Appellant was charged with the three July stalking incidents in a separate indictment.

The defense presented no evidence, and the jury convicted appellant of both stalking offenses. The trial judge sentenced appellant to ten years' imprisonment on each indictment, to be served concurrently. Appellant raised seven points of error on appeal, including his claim that the denial of his severance motion was harmful error. The court of appeals agreed,

reasoning that the evidence for the two offenses was separate and unrelated.[7]    By commingling the evidence, the State "blurred the distinction between the two offenses"[8] and created the inference that "because [appellant] committed other crimes, he probably committed [the] crime charged."[9]   The court of appeals reversed and remanded the case for a new trial.  We granted review to analyze the distinction between our "book-end" decisions in *Llamas v. State*[10] and *Scott v. State*.[11]

## II.

Section 3.02 of the Texas Penal Code permits the consolidation of separate criminal charges against a single defendant that arise out of a single criminal episode.[12]   Separate offenses are part of a "single criminal episode" if

(1)    the offenses are committed pursuant to the same transaction (a single crime spree) or more than one transaction if they are connected by a "common scheme or plan"; or

(2)    "the offenses are the repeated commission of the same or similar offenses."[13]

Allowing the State to prosecute connected or related charges in a single criminal

---

[7] *Werner*, 2013 WL 824040, at *5.

[8] *Id*. at *7.

[9] *Id*. at *5.

[10] 12 S.W.3d 469 (Tex. Crim. App. 2000).

[11]  235 S.W.3d 255 (Tex. Crim. App. 2007).

[12] TEX. PENAL CODE. § 3.02.

[13] TEX. PENAL CODE § 3.01(1), (2).

action, as authorized by Section 3.02, furthers "convenience and efficiency"[14] by curtailing "piecemeal litigation[,] . . . the antithesis of judicial economy."[15] Although the statute's primary purpose is to streamline the judicial process, consolidation also benefits criminal defendants by requiring concurrent sentencing in most instances.[16]

On the other hand, Section 3.04(a) grants defendants an absolute right to sever most charges that have been consolidated under Section 3.02.[17] When a defendant files a motion for severance, the trial judge does not have discretion to deny that motion unless the defendant has been charged with an offense listed in Section 3.03(b).[18] Texas' mandatory severance rule is different from the federal rule of discretionary severance[19] and reflects concerns about the disadvantages defendants may face in a consolidated trial:

---

[14] *Haliburton v. State*, 578 S.W.2d 726, 729 (Tex. Crim. App. 1979).

[15] *See Ex parte Howard*, 685 S.W.2d 672, 674 (Tex. Crim. App. 1985) (Teague, J., concurring and dissenting).

[16] TEX. PENAL CODE § 3.03(a); *Haliburton*, 578 S.W.2d at 729.

[17] TEX. PENAL CODE § 3.04(a); *Waythe v. State*, 533 S.W.2d 802, 804 (Tex. Crim. App. 1976).

[18] TEX. PENAL CODE § 3.04(c). The offenses for which severance is discretionary rather than mandatory include intoxication assault and intoxication manslaughter, various sexual offenses involving children, improper photography, child pornography, human trafficking, compelling prostitution, and certain injury to a child offenses. *Id.* §§ 3.04(c), 3.03(b). If Section 3.03(b) applies, the defendant no longer enjoys a right to mandatory severance, but the trial judge may sever charges if he determines that either the defendant or the State would be unfairly prejudiced by a consolidated trial. Upon such a finding, "the judge may order the offenses to be tried separately or may order other relief as justice requires." *Id.* § 3.04(c).

[19] *Waythe*, 533 S.W.2d at 804. In the federal system, the trial judge enjoys broad discretion to sever offenses if consolidation "appears to prejudice a defendant or the government." FED. R. CRIM. P. 14(a).

 (1) that the jury may convict a 'bad man' who deserves to be punished—not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and (2) that the jury will infer that because the accused committed other crimes, he probably committed the crime charged.[20]

Although Section 3.04 was enacted for the defendant's benefit, the risk he runs in requesting a severance is that the trial judge then has discretion to require consecutive sentences if the defendant is convicted in separate trials.[21]

If a trial judge erroneously denies a severance motion, we review the error under the non-constitutional harm analysis of Rule 44.2(b),[22] disregarding the error unless it adversely affects a defendant's substantial rights.[23]   Neither the defendant nor the State bears the burden of demonstrating harm; instead, we assess harm after reviewing the entirety of the record, including the evidence, jury charge, closing arguments, voir dire, and any other relevant information.[24]

## III.

In this case, the SPA concedes that the trial judge erroneously denied the motion to sever.  Therefore, our inquiry focuses only on whether appellant suffered actual harm by the denial of his severance motion.  The court of appeals stated that the absence of "concrete

---

[20] *Llamas v. State*, 12 S.W.3d 469, 471-72 (Tex. Crim. App. 2000).

[21] TEX. PENAL CODE § 3.04(b); *see Haliburton*, 578 S.W.2d at 729.

[22] TEX. R. APP. P. 44.2(b); *see, e.g., Llamas*, 12 S.W.3d at 470.

[23] *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

[24] *Schutz v. State*, 63 S.W.3d 442, 444-45 (Tex. Crim. App. 2001).

data" in the record strongly influenced its harm analysis.[25]

The court relied on *Llamas*, in which we had found harmful error for the wrongful denial of a severance motion.[26]  In *Llamas*, the trial judge erroneously permitted consolidation of a drug charge with an unrelated motor-vehicle charge,[27] and the jury acquitted the defendant of the drug charge, but convicted on the vehicle charge.[28]  During voir dire, several veniremen commented that evidence relating to the drug charge would color their inquiry into the defendant's guilt for the motor-vehicle charge.[29]  Noting that the jury would not have heard any evidence about drugs but for the consolidated proceeding, we concluded that the error was harmful because the jury might well have convicted the defendant, not because the State proved the elements beyond a reasonable doubt, but because the defendant was a "'bad man' who . . . committed other crimes . . . [and therefore] probably committed" the motor-vehicle offense.[30]  The only commonality between the two offenses was that the police discovered the cocaine at the same time that they arrested the defendant

---

[25] *Werner*, 2013 WL 824040, at *4.

[26] *Id*. at *5.

[27] The defendant was charged with possession of cocaine and possession of a motor vehicle with an altered vehicle-identification number.  *Llamas*, 12 S.W.3d at 469.  The evidence showed that, when the defendant was arrested on the motor vehicle case, officers searched his truck and found a small envelope that contained cocaine.  *Llamas v. State*, 991 S.W.2d 64, 66 (Tex. App.–Amarillo 1998), *aff'd*, 12 S.W.3d 469 (Tex. Crim. App. 2000).

[28] *Llamas*, 12 S.W.3d at 469-70.

[29] *Id*. at 472.

[30] *Id*. at 471-72.

on the motor vehicle charge. In *Llamas*, the State had tried an "apples" offense along with an unrelated "oranges" offense in the hope that the jury would find the defendant guilty of being a generally bad sort.

The SPA relies on our more recent decision in *Scott v. State*,[31] in which we held that a failure to sever was harmless in light of the substantial overlap of evidence.[32] In *Scott*, the defendant was charged with three offenses: (1) inducing sexual performance by a child; (2) producing or promoting a sexual performance by a child; and (3) possession of child pornography.[33] We noted that evidence of the child-pornography charge would have been admissible at a trial for the other two charges.[34] Because "there [was] so much overlap in the evidence used to support" all three charges, we concluded that the defendant suffered no harm from having the child-pornography charge tried with the other two offenses.[35] That is,

---

[31] 235 S.W.3d 255 (Tex. Crim. App. 2007).

[32] *Id*. at 261.

[33] *Id*. at 256.

[34] *Id*. at 258 ("Because the conduct captured on the videotapes that formed the basis of Scott's possession of child pornography offenses . . . was the same conduct at issue in Counts One and Two, the circumstances surrounding Scott's guilty plea to each Count Three would be admissible in a trial on the other counts.").

[35] *Id*. at 259–61. Furthermore, the defendant did not allege how his defensive strategy might have been different had the charges been severed. *Id.*; *see also Darling v. State*, 262 S.W.3d 913, 917-19 (Tex. App.–Texarkana 2008, pet. ref'd) (trial judge's error in failing to grant severance of aggravated sexual-assault-of-a-child charges from indecency-with-a-child charge was harmless error; record contained significant evidence to support jury's guilt verdict on indecency charge that should have been severed); *Hulsey v. State*, 211 S.W.3d 853, 858 (Tex. App–Waco 2006, no pet.) (trial judge's implicit determination that joinder would not result in "unfair prejudice" was not abuse of discretion because defendant's defense to each charge was same–the victim was lying).

the evidence of the child-pornography charge (which the defendant wanted severed from the other two child-sexual-abuse cases) was admissible in any event, and therefore the overlap of evidence was, if not complete, at least very substantial.

*Llamas* and *Scott* are "book-end" cases. When there is no overlap of evidence between the two charges, as in *Llamas*, the failure to sever is most likely to be harmful. When there is a substantial overlap of evidence between the two charges, as in *Scott*, the failure to sever is most likely to be harmless.[36] Although the entire record must be examined, the overlap of evidence is the most important factor under *Llamas* and *Scott*.

In this case, the court of appeals rejected the *Scott* rationale, believing that the two stalking charges were not based on the same evidence.[37] The court of appeals, however, failed to take into account the unique elements of a stalking offense, a crime that depends upon proof of a pattern of conduct, not a single act.

The SPA claims that the record contains ample "concrete data" to establish the harmlessness of the trial court's error. First, the SPA argues that the evidence supporting the April stalking incident was "overwhelming" and eliminated any suggestions that the jury might not have convicted appellant even if that offense had been tried before the July stalking incident ever took place. Second, the SPA contends that evidence of appellant's underlying conduct leading up to and during the April stalking incident would have been

---

[36] One might visualize two different Venn diagrams, one in which there is virtually no overlap between the two circles and one in which the overlap is, if not complete, at least significant.

[37] *Werner*, 2013 WL 824040, at *6.

admissible at any separate trial of the July incident.

Our decisions in *Llamas* and *Scott* depended on whether evidence was admissible in the separate cases, and our inquiry here focuses on the same question. Had the two stalking charges been tried separately, evidence of the underlying conduct in the April incident would have been admissible at the trial concerning the July stalking incident. Rule 404(b) of the Texas Rules of Evidence permits the admission of extraneous-offense evidence to prove elemental facts of the charged offense.[38] The evidence of the prior relationship and the April offense would not have been offered to show that appellant was a bad man who had acted badly before. Instead, evidence of the history of the relationship between appellant and D.D., the escalating incidents of harassment, and the issuance of the protective order would have been relevant to prove that: (1) appellant intended to place D.D. in fear when he twice drove by her home in July and then parked near her bank ATM on July 16th; (2) D.D. was actually placed in fear by appellant's actions on July 13th, 14th, and 16th; and (3) D.D.'s fear in July was reasonable.[39] These are all elements of the offense of stalking.[40]

---

[38] *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005).

[39] *See, e.g.*, *Brawner v. State*, ___ S.W.3d __, __, 2013 WL 3071000, at *10 (Ark. Ct. App. June 19, 2013) (evidence of defendant's prior bad acts was independently relevant, in prosecution for stalking and violation of a protective order, to establish victim's legitimate, imminent fear of death or serious bodily injury for herself and her family, as well as defendant's motive and intent); *State v. O'Brien*, 986 N.E.2d 531, 540-41 (Ohio Ct. App. 2013) (evidence of defendant's history of stalking and harassing victim, protection order entered against him, and prior threats to kill victim, was relevant under Rule 404(b), in trial for felony murder, felonious assault, and related offenses, to show that defendant had intent to strike victim with his vehicle); *Walker v. State*, 267 P.3d 1107, 1111 (Wyo. 2012) (acts comprising a course of conduct of harassment admitted as uncharged misconduct proved an element of the charged offense; "as in all stalking cases, the course of conduct is the criminal act

Without the evidence of the prior escalation of appellant's text messaging, his creepy knowledge of D.D.'s whereabouts, the discovery of two separate illegal tracking devices put underneath the very same bumper of D.D.'s car on two different occasions, the tire-slashing incident, and the issuance of the protective order after appellant's first arrest, the evidence would probably be insufficient to establish "stalking" in the three July incidents.[41]  Here, as in *Scott*, the evidence of the April and July offenses overlapped substantially, and evidence of the entire prior relationship between appellant and D.D. would have been admissible to establish elemental facts of the July offense.[42]  Severing the charges would have made no

at issue, it is not uncharged misconduct."); *State v. Hormann*, 805 N.W.2d 883, 888 (Minn. Ct. App. 2011) (victim's testimony regarding history of relationship with defendant and evidence that he had placed a tracking device on her car was not character evidence in prosecution for stalking; rather, it was relationship evidence relevant to prove that defendant had reason to know his conduct would cause wife to be fearful); *Kenison v. State*, 107 P.3d 335, 343-44 (Alaska Ct. App. 2005) (State was entitled to introduce evidence of defendant's "entire course of non-consensual contact" with stalking victim and his repeated harassment and threats offered to prove victim's fear of defendant).

[40] Under Section 42.072, the State must prove that the defendant, on more than one occasion and pursuant to a scheme or course of conduct directed specifically at another person, knowingly engages in conduct that
        (1)     the actor knows or reasonably believes the other person will regard as threatening;
        (2)     causes the other person . . . to be placed in fear . . .; and
        (3)     would cause a reasonable person to fear . . . .
TEX. PENAL CODE § 42.072(a).

[41] *See, e.g.*, *McGowan v. State*, 375 S.W.3d 585, 590, 593 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (in a stalking case, evidence of defendant's prior emails and blog posts admissible under TEX. R. EVID. 404(b) to establish complainant's fears of bodily harm; "The offense of stalking contemplates the presentation of evidence that covers the entire course of alleged unlawful conduct specifically directed toward a complainant."); *Pomier v. State*, 326 S.W.3d 373, 380 (Tex. App.–Houston [14th Dist.] 2010, no pet.) (same).

[42] In our view, *Scott* does not stand for the position that failure to sever constitutes harmless error *only* if the same set of evidence proves both charges. For the error to be harmless, *Scott* requires a substantial degree of evidentiary overlap, not that the charges rely on identical, metaphysically

difference in the evidence presented to a jury deciding appellant's guilt on the July indictment.

Of course, had the charges been tried separately, evidence of the July stalking incident would not have been admissible at the trial on the April indictment—after all, the July incidents had yet to occur when the April offense was committed and that indictment was filed. But testimony concerning the July stalking incident could have had—at most—only a negligible impact on the jury's deliberations on the April indictment.

Standing alone, the State's evidence against appellant for the April stalking offense was overwhelming. The trial record paints a vivid picture of surveillance, tracking, texting, and intimidation that would have had George Orwell himself looking over his shoulder. On three separate occasions, appellant purchased sophisticated GPS tracking devices, two of which were later found underneath D.D.'s car. Relying on his access to the trackers' telemetry, appellant repeatedly sent D.D. text messages to flaunt his familiarity with her comings and goings and to threaten retaliation or vengeance. Appellant sent inappropriate letters to D.D.'s mother and grandmother suggesting that D.D. was an unfit mother because she let her daughter spend the night at her boyfriend's home. As the final straw, the evidence showed that three of D.D.'s car tires were slashed by a man who looked like appellant and who drove a car matching appellant's car.

Overwhelming evidence of guilt is a relevant factor in any Rule 44.2(b) harm

indiscernible sets of proof.

analysis,[43] and, considering the overwhelming evidence that proved the April incident, any evidence of the significantly less threatening July incidents would have impacted the jurors' deliberations only marginally, if at all.

The court of appeals stated that the prosecution's "wealth of evidence" actually *increased* the likelihood of harm.[44] In that court's view, the overwhelming evidence of the April offense made the jury more likely to convict appellant for the July offense on the basis of his prior misdeeds, not the behavior alleged in the indictment. But here, as in *Scott*, all of the evidence concerning the April offense would have been admitted at any separate trial on the July incident. The court of appeals erred in concluding, "Evidence of what appellant did in March and April is no proof of what appellant did in July."[45] That might be an accurate statement for many offenses, but because of the specific elements of the offense of stalking,[46] evidence concerning the entire history of appellant's and D.D.'s relationship (including the April incidents) would have been admitted to prove the July stalking elements.

Appellant also contends that the venire members' statements during voir dire show prejudice, just as in *Llamas*, because a couple of jurors indicated that they would not be

---

[43] *Motilla v. State*, 78 S.W.3d 352, 356-57 (Tex. Crim. App. 2002). *See also, e.g.*, *Whitaker v. State*, 286 S.W.3d 355, 363-64 (Tex. Crim. App. 2009).

[44] *Werner*, 2013 WL 824040, at *5-6.

[45] *Id.* at *5.

[46] Stalking requires proof that the defendant acted "on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person[.]" TEX. PENAL CODE § 42.072(a).

tolerant of someone who had repeatedly committed the offense of stalking.[47]  The voir dire statements were pivotal in *Llamas* to show harm because that jury had no business considering the two charges together.  Here, on the other hand, the jury would have been permitted to consider evidence of the April offense when deliberating on the July offense.

Appellant also claims that the prosecutor's final argument demonstrated harm because the prosecutor "freely referred the jury to evidence supporting both cases, switching between one and the other without making a distinction between the two."[48]  Indeed, the prosecutor did refer back and forth to the evidence concerning the April and July incidents, but that was entirely appropriate as all of the evidence concerning the history of the relationship between appellant and D.D. was admissible and therefore available for the prosecutor to use during closing argument.

Finally, appellant suggests that he was harmed by the consolidation because the judge sentenced him to the maximum of ten years' imprisonment for each offense.  But at least those sentences must be served concurrently.  Had the trial judge severed the two charges, he could have sentenced appellant to ten years' imprisonment on each offense to be served

---

[47] *Werner*, 2013 WL 824040, at *5.  The court of appeals stated,
> One venire member expressed the following reservation:
>> I am basing it on the fact that you have two different times that it is done; and I say that it was a push-off from the start; and, if it is the first time and I am back doing it a second time, then I don't have any tolerance for it either.
> Another venire member agreed, saying, "I kind of agree with Juror No. 23. Given the two stories here and hearing some of these stories, I don't think that I can be fair."

[48] Appellant's Brief at 8.

consecutively.[49]

In sum, we conclude that the denial of appellant's severance motion was harmless error. This case bears greater resemblance to *Scott*, in which the consolidated charges related to each other and were based on a common set of facts, than it does to *Llamas* in which the evidence of one charge was wholly unrelated to the evidence of the other charge. Therefore, we conclude that appellant's substantial rights were not affected by the denial of his severance motion. We reverse the judgment of the court of appeals, and remand the case to that court to address appellant's remaining points of error.

Delivered: October 30, 2013
Publish

---

[49] TEX. PENAL CODE § 3.04(b).