**Opinion filed January 30, 2014**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-12-00020-CR, 11-12-00021-CR, & 11-12-00022-CR

_____

## JESSE JAMES RODRIGUEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 21st District Court**

**Bastrop County, Texas**

**Trial Court Cause Nos. 13975, 13976, & 13977**

### M E M O R A N D U M   O P I N I O N

The jury found Jesse James Rodriguez guilty of three offenses: sexual assault, aggravated sexual assault, and indecency with a child by exposure. The State alleged two enhancement paragraphs in each of the three cases,[1] and the trial

---

[1]Appellant had previously been convicted (1) of attempted burglary of a building in 1991, a third-degree felony, and (2) of indecency with a child by contact in 1993, a second-degree felony.

court found the two enhancement paragraphs in each case to be "true." Based on these findings, the trial court assessed Appellant's punishment for each conviction at life imprisonment. The trial court ordered the sentences for sexual assault and aggravated sexual assault to run concurrently. The trial court ordered that the sentence for indecency with a child by exposure commence once Appellant had completed the other two sentences.[2] We affirm.

## I. *The Charged Offenses*

The grand jury charged Appellant with sexual assault[3] of his then wife, M.Q., and aggravated sexual assault[4] of his then brother-in-law, A.Q, a disabled individual who has Down syndrome. These charges arose from an incident where Appellant coerced M.Q. and A.Q. to engage in sexual intercourse with each other after he threatened to sexually abuse A.R. if his demands were not met. The grand jury also returned an indictment against Appellant for indecency with a child by exposure when Appellant held his minor daughter, A.R., down on a bed while he masturbated and stared at her feet and touched them.[5]

## II. *Procedural History*

The State filed a notice to consolidate Appellant's three indictments into one trial. Appellant opposed consolidation and moved to sever each indictment into a separate case. Before jury selection began, the trial court heard Appellant's

---

[2]In the punishment phase, Appellant admitted that A.R. had testified truthfully and that he had exposed himself to her; he also wrote a letter to the judge in which he admitted his guilt and stated that he had wronged A.R. But Appellant still denied he had forced M.Q. to have sexual intercourse with her disabled brother, A.Q.

[3]*See* TEX. PENAL CODE ANN. § 22.011 (West 2011).

[4]*See id.* § 22.021 (West Supp. 2013).

[5]This offense occurred when A.R. was ten years old, which was approximately a year prior to the event that supported the other two indictments. *See id.* § 21.11.

motions to sever, denied them, and proceeded to trial on all three cases before the same jury.

### III. *Evidence at Trial*

Appellant's ex-wife, M.Q., testified that she and Appellant, along with their four children—A.R., age 12; J.R., age 10; M.R., age 7; and R.R., age 3—and her son from a prior relationship, who was 21 years old, all lived in Bastrop, Texas, with M.Q.'s 95-year-old grandmother and her 40-year-old disabled brother, A.Q. Appellant and M.Q. met in 1997. M.Q. said she and her children as well as Appellant and her brother had lived in Austin from 1997 to 2004, then moved to Wisconsin in 2005, and returned to Texas in 2007.

Appellant began to abuse his daughter, A.R., in 2004 and the sexual abuse took several forms and continued for six years. Appellant's ex-girlfriend, Stephanie Coy, indicated that Appellant had told her that he had sexual urges for his minor daughter, A.R. Appellant denied that he had ever told Coy that he had urges for A.R., but he admitted that he had a foot fetish and a problem.[6] A.R. testified that Appellant made her show him her feet on multiple occasions, including one time in July 2008, when Appellant took A.R. into a bedroom and held her down while he looked at, touched, and masturbated on her feet. This incident in 2008 was the basis for the indecency charge.

A.R. testified that the first instance of abuse occurred when she was four years old when Appellant forced her to take a bath with him and rub his body with soap. In accordance with Appellant's demand, A.R. rubbed Appellant's arms and legs with soap. A.R. also recalled one incident when Appellant "kissed" her

---

[6]Appellant had a family photo album that he kept in the closet of the master bedroom that included ordinary pictures of his children and family members as well as provocative computer pictures of Elvira, a television and film celebrity; pornographic pictures of nude adult women that emphasized their feet; and one pornographic image that depicted sexual intercourse between a nude adult man and woman. In addition, a picture of a child's feet, with the head and body of the image torn off, also was found in the album.

vagina as she changed clothes and later slapped her on her "butt" even though she was not in trouble and was not being punished.

A.R. also testified that Appellant had exposed his genitals to her several times and had rubbed his private parts both over and under his clothing. Appellant also forced her to watch pornographic movies. A.R. said that Appellant masturbated in her presence while the pornographic or sex movies played. A.R. testified that the movies depicted strippers, which she said were people who danced and took their clothes off in front of people; she also said the movies depicted nude adult men and girls and men and women having sexual intercourse.

A.R. said she saw Appellant rub his genitals in her presence more than five times. A.R. also testified that Appellant's penis was darkish-brown and hairy and that she saw white stuff, which she called "sperm," come out of it. A.R. said she learned in science class that the white stuff she saw was called sperm. A.R. also said that Appellant made her touch his private parts both under and over his clothing.

Appellant's sexual abuse of others was not limited to A.R. His ex-wife, M.Q., testified that, in 2004, Appellant first told her he wanted to watch her have sex with other men. When M.Q. refused, Appellant used a screwdriver to threaten physical harm to their infant son. Out of fear for her children's safety, M.Q. eventually submitted to Appellant's demands and engaged in sexual acts with another man on several occasions while Appellant watched and masturbated.

Appellant once told M.Q. to have sex with her male coworker and to return home with "lots of hickeys" all over her body. When M.Q. went to the coworker's home to fulfill Appellant's demand, Appellant called her repeatedly and ordered her to return home immediately. When M.Q. returned home, Appellant punched her in the face and gave her a black eye.

4

Appellant also told M.Q. that he wanted to watch her "masturbate" her brother, A.Q. On several occasions, in accordance with Appellant's demands and threats, M.Q. rubbed A.Q.'s genitals with her feet. M.Q. testified that Appellant had a "foot fetish" and often masturbated as he held one of her feet and watched her perform sexual acts on A.Q. Later, Appellant demanded once again that M.Q. have sex with a coworker, and she attempted to do so to satisfy Appellant's sexual desires. M.Q. said that Appellant wanted her to have sex with a coworker at their house so that Appellant could not only masturbate in front of them while they engaged in intercourse, but also videotape the entire episode.[7] After the coworker did not show up as planned, Appellant demanded that M.Q. have sex with A.Q. so he could watch and masturbate. Appellant threatened to sexually assault A.R. if M.Q. did not submit to his demands.

Because she was afraid that Appellant would "rape" A.R. if she did not do what he said, M.Q. had sexual intercourse with A.Q. while Appellant watched and masturbated while in bed with them. M.Q. testified that she believed Appellant's threat against A.R. was credible because A.R. had recently told her that Appellant had once held A.R. down and masturbated on her feet.

A few days after M.Q. and A.Q. had sexual intercourse, M.Q. gathered A.Q., A.R., and her other four children and drove the family from Bastrop to Austin. After the family arrived in Austin, M.Q. drove to the Austin Police Department to hand over the family gun so that Appellant could not use it against the family. After M.Q. arrived at the police station, she told her story to Officer Jason Goodman. The testimony of several witnesses, including Officer Goodman, showed that M.Q. consistently recounted to others the events that compelled her, against her will, to have sexual intercourse with her own brother.

---

[7]The police found a camcorder in the master bedroom and a video that depicted a 30-second clip of the bed in the bedroom. Police testified that the video looked like someone had set up the camera to videotape something that would occur on the bed.

Dr. Maurine Burrows testified that she met with A.Q. to evaluate his competency as a witness and to assess the severity of his disability. Dr. Burrows concluded that A.Q. was a disabled individual that operated at the level of a four-year-old child and had no ability to consent to sexual activity. Dr. Burrows further determined that A.Q. could not communicate about any sexual abuse and was not competent to testify.

Several witnesses testified that A.R. had shared her allegations of abuse with them. Mindy Graber, a forensic interviewer with the Child Advocacy Center, testified that A.R. told her that Appellant had once taken her to his bedroom, held her down on the bed, and masturbated while he stared at her feet. A.R. also informed Graber that Appellant, in reference to his sexual demands of A.R., once said, "Your mom doesn't show me her feet and you're going to suffer the consequence."

Appellant testified and denied the allegations made by M.Q. and A.R. He also denied he ever made any threats against his children. Although Appellant—in response to a police pretext call from M.Q. where she accused him of harm to her daughter, brother, and her—admitted that it was all his fault and that he would not do "this s--t no more," Appellant nonetheless testified that M.Q. fabricated all of the allegations out of anger because of his extramarital affair and his past criminal history and because she wanted a divorce. He also said M.Q. and A.R. had fabricated the allegations because M.Q. and A.R. had a close bond.

IV. *Issues Presented*

Appellant presents two issues in each appeal. First, Appellant argues that the trial court erred when it consolidated his three indictments into one case and denied his motions to sever. Second, Appellant argues that the trial court abused its discretion when it failed to grant his severance request, which he was entitled to

6

under Section 3.04 of the Texas Penal Code,[8] and that the failure of the trial court to grant his severance request unfairly prejudiced him.

## V. *Standard of Review*

We review the decision of a trial court to grant or deny a severance request, based upon a statute, for an abuse of discretion. *Salazar v. State*, 127 S.W.3d 355, 365 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). A trial court's failure to grant a mandatory severance under Section 3.04 of the Texas Penal Code is error. If such an error occurred, then we conduct a harm analysis in which we consider everything in the record, including all the evidence admitted, the closing arguments, and the jurors' comments during voir dire. *Llamas v. State*, 12 S.W.3d 469, 470–71 (Tex. Crim. App. 2000). If the error did not adversely affect the defendant's substantial rights, then it is harmless. TEX. R. APP. P. 44.2(b); *Werner v. State*, 412 S.W.3d 542, 547 (Tex. Crim. App. 2013) (severance error harmless where significant overlap of evidence and evidence of guilt overwhelming); *Scott v. State*, 235 S.W.3d 255, 256–57 (Tex. Crim. App. 2007) (error harmless where significant overlap of evidence). *But see Llamas*, 12 S.W.3d 469 (error harmful where no overlap in evidence).

## VI. *Analysis*

### A. Consolidation of Cases

Cases against a defendant may be consolidated by the State when the charged offenses arise out of the same criminal episode. TEX. PENAL CODE ANN. § 3.02(a) (West 2011) (stating that "[a] defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode"); *Salazar*, 127 S.W.3d at 363–64. A "criminal episode" is defined as the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property, under the following circumstances:

---

[8]TEX. PENAL CODE ANN. § 3.04 (West 2011).

(1) the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan or (2) the offenses are the repeated commission of the same or similar offenses. TEX. PENAL CODE ANN. § 3.01 (West 2011). It is unnecessary that the offenses that make up a criminal episode occur on a single date, at a single place, or against a single complainant. *Diaz v. State*, 125 S.W.3d 739, 742 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Rather, a criminal episode may comprise offenses against different complainants and may even take place over a period of years. *Id.*

Appellant faced three charges based on related allegations of sexual misconduct that involved his obsession with feet and deviate sexual acts. A.R. testified that, during the summer when she was ten years old (2008), Appellant carried her to his bedroom, held her down, and masturbated while he stared at her feet and touched them.

According to the testimony of Graber, Appellant told A.R. that she had to "suffer the consequence" of M.Q.'s refusal to show Appellant her feet, which indicated that Appellant's sexual abuse of A.R. resulted from M.Q.'s failure to obey his sexual commands. A.R. also recounted many other instances of abuse, including other acts of exposure by Appellant; Appellant forcing her to watch pornographic movies while he masturbated in her presence; Appellant kissing her vagina; Appellant forcing her to touch his private parts, under and over clothing; and Appellant making her touch his private parts, both under and over his clothing.

In late November 2009, A.R. told M.Q. about the July 2008 incident of sexual abuse. A few days later, Appellant forced M.Q. to have sexual intercourse with her brother, A.Q., when Appellant threatened he would turn to A.R. for sexual gratification if M.Q. refused to obey his orders. M.Q. believed Appellant's threat to be credible and had sexual intercourse with her brother out of fear that Appellant would "rape" A.R. if M.Q. did not submit to his demands. M.Q. also recounted the

8

multiple instances where Appellant forced her to have sex with other men and to use her feet to masturbate her brother, A.Q., while Appellant held her foot and masturbated.

Appellant's charged offenses were based on connected incidents that constituted a single criminal episode. *See* PENAL § 3.01(1). Even though one of the offenses occurred more than a year before the other two offenses and involved different victims, the trial court was within its discretion to find that the offenses arose out of the same criminal episode. *See Diaz*, 125 S.W.3d at 742.

*B. Right to Severance*

We now turn to whether Appellant had an absolute right to severance. Even though the State can consolidate multiple offenses from a single criminal episode into one trial under Section 3.02(a), as quoted above, a defendant has the right to sever multiple indictments for offenses that the State consolidated into one trial setting. Section 3.04(a) states, "Whenever two or more offenses have been consolidated or joined for trial under Section 3.02, the defendant shall have a right to a severance of the offenses." PENAL § 3.04. However, the defendant's right is not absolute.

A defendant's right to severance is limited by Section 3.04(c) of the Texas Penal Code, which states that the right to severance does not apply to a prosecution for offenses described by Section 3.03(b) "unless the court determines that the defendant or the state would be unfairly prejudiced by a joinder of offenses, in which event the judge may order the offenses to be tried separately or may order other relief as justice requires." *Id.* § 3.04(c). Section 3.04(c) only applies to the offenses described in Section 3.03(b), which provides that the listed sexual offenses must be "committed against a victim younger than 17 years of age at the time of the commission of the offense." *Id.* § 3.03(b)(2)(A); *see Getts v. State*, 155

9

S.W.3d 153, 155 (Tex. Crim. App. 2005) (stating that, when statutory language is clear and unambiguous, the plain meaning of those words is applied).

The State argues that Appellant did not have an absolute right to severance because the rationale that restricts that right of severance in cases of sexual abuse against victims under the age of seventeen in Sections 3.04(c) and 3.03(b) should be extended to this case based on the child-like nature of the 40-year-old Down syndrome victim, A.Q. Conversely, Appellant argues that, because only one of the three victims was under the age of seventeen, he had an absolute right to severance. Appellant relies on Section 3.04(a) and *Casey v. State*, 349 S.W.3d 825, 832 (Tex. App.—El Paso 2011, pet. ref'd), as support for his argument.

The right to severance rests upon two legitimate concerns: (1) that the jury may convict a "bad man" who deserves to be punished—not because he is guilty of the crime charged but because of his prior or subsequent misdeeds—and (2) that the jury will infer that, because the accused committed other crimes, he probably committed the crime charged. *Llamas*, 12 S.W.3d at 471–72. Because of the clear and unambiguous statutory language and the fact that only one of the three charges Appellant faced involved a victim under the age of seventeen, Section 3.04(c) is not applicable, and severance should have been granted. We now turn to whether Appellant was harmed by the failure of the trial court to grant his severance request and conduct three trials.

*C. Harm Analysis*

Appellant contends he was unfairly prejudiced by the joinder of offenses, and he asserts that the standard in Section 3.04(c) is the proper standard to determine the extent of his harm. But this standard is not applicable because Section 3.04(c) does not apply.

The proper standard, instead, is to determine whether Appellant's substantial rights were adversely affected by the trial court's failure to grant his motions to

sever.  TEX. R. APP. P. 44.2(b); *Werner*, 412 S.W.3d at 547; *Scott*, 235 S.W.3d at 256–57; *Llamas*, 12 S.W.3d at 469–70.

A defendant's substantial rights are not affected if the appellate court has fair assurance that the error did not influence the jury or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  If the jury would have heard the same evidence regardless of whether the offenses were tried separately or together, the joinder of the offenses in a single trial could not have affected the defendant's substantial rights.  *Rogers v. State*, 853 S.W.2d 29, 32–34 (Tex. Crim. App. 1993).  In addition, the harm analysis requires the court to consider if there is overwhelming evidence of guilt, which will tend to support a lack of harm from any severance error.  *Werner*, 412 S.W.3d at 547.

### 1.  Sexual Assault and Aggravated Sexual Assault Offenses

#### a.  Same Transaction Contextual Evidence

Evidence of extraneous offenses connected with a primary offense may be properly admitted as same transaction contextual evidence.  *Mayes v. State*, 816 S.W.2d 79, 86–87 (Tex. Crim. App. 1991).  Same transaction contextual evidence is background evidence admitted to show the context in which the criminal act occurred.  *Brown v. State*, 243 S.W.3d 141, 151 (Tex. App.—Eastland 2007, pet. ref'd).  There is a two-part test: the first is relevance and the second is whether the evidence should be admitted under an exception to TEX. R. EVID. 404(b).  *Rogers*, 853 S.W.2d at 32; *Mayes*, 816 S.W.2d at 85.  Same transaction contextual evidence is admissible, as an exception under Rule 404(b), where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." *Mayes*, 816 S.W.2d at 86–87 n.4.

Necessity is a key element to the determination of whether same transaction contextual evidence is admissible. *See Rogers*, 853 S.W.2d at 33 (only if the facts and circumstances of the instant offense would make little or no sense without the admission of the same transaction contextual evidence should the evidence be admitted). Appellant's threats and attacks on M.Q. and A.Q. are the same act and are so intertwined with the State's proof of each charged crime that avoiding reference to them would have made the State's case incomplete and difficult to understand. *See Prible v. State*, 175 S.W.3d 724, 732 (Tex. Crim. App. 2005). In addition, the circumstances of how Appellant threatened M.Q. with harm to A.R. and how M.Q. knew of one of his many attacks on A.R., which compelled M.Q. to engage in sexual acts with her brother, A.Q., against her will, are admissible to show the overall context in which the criminal acts against M.Q. and A.Q. occurred. *See Mayes*, 816 S.W.2d at 86.

Whether the two cases were tried together, as here, or separately, the evidence about the same criminal acts that Appellant committed against M.Q. and A.Q. and his threats to attack A.R., along with M.Q.'s awareness of one attack, would have been relevant and admissible in each separate case. The former would have outlined that the criminal acts stemmed from one incident with M.Q. and A.Q. The latter would have shown M.Q.'s belief in Appellant's threats against A.R., and her knowledge of one assault led M.Q. to reasonably believe that Appellant would make good on his threats. *See* PENAL § 22.011(b)(7).

### b. Rebuttal of Fabrication Defense

The evidence of the two criminal acts against M.Q. and A.Q., as well as the indecency charge against Appellant for his criminal act with A.R., would be admissible in the two cases that involved M.Q. and A.Q. to rebut Appellant's defense of fabrication. *De La Paz v. State*, 279 S.W.3d 336, 343–50 (Tex. Crim. App. 2009); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

12

Appellant claimed that M.Q. and A.R. had lied about him because of a close bond that they had or because of his marital infidelity and criminal past, which prompted M.Q. to seek a divorce. Appellant also claimed that these three charges "would be one of the ways to try to get things in favor of the mother . . . as to who gets custody of the child."

The evidence of his acts against M.Q. and A.Q. and his indecency by exposure to A.R. would have been admissible in each trial, had they been separate, to rebut Appellant's defense of fabrication. The evidence would corroborate M.Q.'s acquiescence to his deviate sexual demands to avoid injury to A.R., while A.R.'s testimony would corroborate Appellant's ability to carry out his threats because he had, in fact, attacked her over a long period of time prior to the incident with M.Q. and A.Q. And, in all three cases, his obsession with feet, and his own admitted problem with that issue, corroborated the testimony of M.Q. and A.R. and further rebutted his fabrication defense. Moreover, Investigator Jeff Goff with the Bastrop County Sheriff's office interviewed P.A., M.Q.'s coworker. Investigator Goff testified that P.A. corroborated M.Q.'s testimony about Appellant's demands for her to have sexual liaisons with P.A.

### 2. *Offense of Indecency with a Child by Exposure*

Appellant argues that severance was required because the indictment that involved A.R. was dissimilar to the other two indictments. We tend to agree. Had the trial court severed the single case into three cases, the extraneous offense evidence of Appellant's attack on M.Q. and A.Q. might have been admissible to rebut, as we have explained, his fabrication theory. *De La Paz*, 279 S.W.3d at 343–50. But because the indecency charge occurred prior to the other charges, we do not see a significant overlap of evidence between the charges that involved M.Q. and A.Q. and the indecency charge.

13

### 3. Overwhelming Evidence of Guilt

The Court of Criminal Appeals pointed out that, to analyze any harm, the second most important factor was overwhelming evidence of guilt. *Werner*, 412 S.W.3d at 547. In all three cases, but most especially the indecency charge, there was overwhelming evidence of guilt. Evidence from multiple witnesses was adduced that Appellant had a foot fetish and problem and had urges toward his daughter, A.R. Evidence was adduced of his obsession for visual stimulation, including his photo album and his assault on A.R. that involved staring at her feet while he masturbated. He also compelled his wife to masturbate A.Q. using her feet, while Appellant masturbated in their presence as he held one of her feet. Appellant also compelled M.Q., other men, and A.Q. to engage in sex or A.R. would "suffer the consequence."

But unbeknownst to M.Q., Appellant had already begun a continuous and escalating pattern of abuse on A.R. when she was four, which continued until she was ten. A.R. was subjected to multiple instances of abuse by being forced to touch Appellant's private parts, watch sex movies, and have him inappropriately touch her feet and kiss her private parts. The latest incident, the indecency charge with A.R., as A.R. testified, involved him holding her down and masturbating as he looked at and touched her feet. During a pretext call set up by Bastrop law enforcement in which M.Q. confronted Appellant with accusations that he had hurt her daughter, brother, and her, Appellant admitted that it was all his fault and that he would not do "this s--t no more." Appellant's substantial rights were not affected where there was such overwhelming evidence of guilt and where consolidation likely had little or no effect on the jury's verdicts.

## VII. *Conclusion*

Because the trial court in a separate trial for each offense could have admitted evidence of the other offenses to show same transaction context or to

14

rebut Appellant's suggestion of fabrication, separate juries would have heard similar evidence, although the offenses that involved M.Q. and A.Q. probably would not have been admissible in a separate trial of the indecency charge. But based upon the entire record, including voir dire, the evidence, the jury charge, and closing arguments, and upon the overwhelming evidence of guilt as to each offense, we cannot hold that Appellant's substantial rights were adversely affected by the joinder of the offenses into a single trial. *See Werner*, 412 S.W.3d at 551; *Rogers*, 853 S.W.2d at 32–34; *see also* TEX. R. APP. P. 44.2(b). Although the trial court erred when it failed to grant Appellant's motions to sever, the trial court's error was harmless because it did not affect Appellant's substantial rights. Appellant's two issues in each appeal are overruled.

## VIII. *This Court's Ruling*

We affirm the judgments of the trial court.


MIKE WILLSON

JUSTICE


January 30, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.