

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOEL GARCIA, | § | No. 08-19-00274-CR |
| Appellant, | § | Appeal from the |
| v. | § | 210th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20150D00100) |

## **O P I N I O N**

Following a high-speed collision which caused three fatalities, Appellant Joel Garcia was indicted and later convicted by a jury of three counts of intoxication manslaughter.[1] On appeal, Garcia challenges his conviction in four issues, three asserting erroneous admission of evidence while the fourth asserts improper argument by the State. Finding no error, we affirm.

---

[1] In a prior appeal, we sustained the State's sole point of error challenging the trial court's suppression of blood alcohol test results. See *State v. Garcia*, No. 08-15-00264-CR, 2017 WL 728367 (Tex. App.—El Paso Feb. 24, 2017, pet. granted) (not designated for publication). The Court of Criminal Appeals reversed that decision, holding the trial court did not abuse its discretion in suppressing the evidence. *State v. Garcia*, 569 S.W.3d 142, 159 (Tex. Crim. App. 2018). This case now returns to this Court following a jury trial.

# I.   BACKGROUND

*The Collision*

On December 24, 2014, at about 1:40 a.m., El Paso police officers Jacob Kiesel and Oscar Gabaldon, who were then working patrol, received a call reporting a traffic collision involving vehicles on fire at the intersection of Joe Battle Boulevard and Vista Del Sol. Two women, Jennifer Loera and Estella Renteria, who were riding together in a non-involved vehicle, witnessed the collision and reported the incident. Loera testified she stopped and called 911 after seeing a Camaro "zoom" past her, run a red light, and "T-bone" a white vehicle. Loera's 911 call was admitted into evidence and played for the jury. Loera also testified that, while the white vehicle was engulfed in flames, the driver of the Camaro, who was later identified as Garcia, insisted they should all leave the scene. In the recorded call, Loera can be heard screaming at Garcia, pleading that if he has a heart, he should not leave the scene. Loera testified that Garcia looked drunk or intoxicated. Renteria, the second witness, corroborated Loera's account of Garcia causing the collision, wanting to leave the scene, and appearing intoxicated.

In addition to patrol officers, other officers were assigned to the call. Officer Adrian Armendariz of the special traffic investigations unit (STI) soon arrived on scene to investigate and collect evidence. The STI unit investigates all fatalities occurring within the city. Officer Armendariz testified at trial providing his opinion as a crash reconstruction expert. He testified he formed an opinion as to the cause of the crash based on what he saw at the scene, on interviews he conducted, on statements he reviewed, and the investigation he performed. He also prepared a report admitted at trial. Armendariz testified three main factors caused the collision: (1) the

2

intoxicated state of Garcia; (2) the failure to stop at the red light by Garcia; and (3) the speed of Garcia's vehicle.

The vehicle struck by Garcia's was then occupied by Joshua Deal ("Joshua"), Isaiah Deal ("Isaiah"), and Shannon Del Rio ("Shannon"). On impact, both cars erupted into flames, and Joshua, Isaiah, and Shannon all perished in the crash—later autopsies revealing all three died of multiple blunt-force injuries, specifically, transected aortas. At the time of the collision, Garcia was traveling in a Camaro with Enrique Gaucin, his only passenger. Gaucin testified he recalled regaining consciousness after the collision, getting out of the burning Camaro, and dragging Garcia—who was then awake and already out of the car—a distance away from the burning vehicles which he thought were going to explode.

Patrol Officer Kiesel testified, while he was rendering aid to Isaiah, trying to revive him, he saw Garcia engage in behavior indicative of a flight risk—Garcia was "constant[ly] moving and looking around for a place to run . . . ." As a result, Officer Kiesel ordered other officers to prevent him from leaving the scene. When firefighters and paramedics arrived, Isaiah, still unresponsive, was given CPR and soon taken to the hospital by ambulance. James Gunther, one of the firefighter EMTs of the El Paso Fire Department who arrived on scene, also testified. Gunther testified it took a while before firefighters realized there was more than one car involved in the collision. Gunther described they were unable to easily extinguish the burning vehicles and ran out of water—300 gallons were used. It was not until about 15-20 minutes after first responders arrived that they learned that Joshua and Shannon were still inside one of the burning vehicles.

A battalion chief instructed Gunther to check vitals and render aid to Garcia, who was by then sitting in a police unit. Gunther recalled Garcia seemed mostly concerned about his car.

3

Gunther asked a series of questions, including whether Garcia felt any pain and if he had anything to drink. Garcia stated he had foot pain and had "[f]ive beers and three shots." When asked to describe Garcia's physical condition, Gunther testified Garcia had wet, glossy, marble-like eyes and a strong smell of alcohol on his breath. In response to being asked to scale Garcia's intoxication level, Gunther scored Garcia on the night of the collision an eight out of ten. Another firefighter who treated Garcia at the scene, Adrian Palomo, also testified to his encounter and assessment of Garcia. Palomo stated Garcia initially complained of foot pain, but he did not want to go to the hospital. Palomo noted on his assessment report that Garcia had a smell of alcohol on his breath, slurred speech, and glossy, red eyes. When asked at trial, without objection, whether he formed an opinion as to whether or not Garcia was intoxicated, Palomo responded, "He was intoxicated." Palomo then added that Garcia's degree of intoxication, on a scale of one to ten, was about an eight.

Officer Andres Rodriguez of the El Paso Police Department arrived on scene at about 1:52 a.m., and after being debriefed, he took custody of Garcia and placed him in the back of his patrol unit. Before moving forward with arresting Garcia, Officer Rodriguez wanted more information to determine whether Garcia was the driver and whether he was intoxicated. Officer Rodriguez testified Garcia had bloodshot eyes, slurred speech, and a strong alcohol odor. A witness positively identified Garcia as the driver and after being *Mirandized*, Officer Rodriguez arrested Garcia and told him he was under arrest for driving while intoxicated. After being placed under arrest, Garcia refused to take a breath test, claiming he was not the driver. The paramedics then took custody of Garcia and asked him about any injuries and whether he had been drinking. Officer Rodriguez was standing close by and heard Garcia say "yes" in response to being asked whether he had been

4

drinking. Garcia never submitted to a breath test, refused to consent to a blood test, and neither the standard field sobriety tests, nor the horizontal-gaze-nystagmus ("HGM") test were administered due to the chaotic nature of the crime scene and because Garcia was limping and complaining of foot pain. Garcia was ultimately transported to a hospital.

*The Hospital*

Garcia was admitted to the emergency room at Del Sol Hospital for treatment. Steven Anaya, a registered nurse working in the emergency room that night, testified he was "flagged . . . down" by Garcia on two occasions: once to request a blanket, and a second time for a glass of water. Anaya testified "the entire room, emanating from the patient, he reeked of alcohol. His speech was heavily slurred, his eyes were bloodshot." Anaya testified on a scale of one to ten, he rated Garcia's intoxication level at least at a six. Jamie Salcido, a registered nurse assisting with trauma at Del Sol, testified she stood at the head of the bed while a doctor performed an assessment; she recalled that Garcia did not have visual injuries on his person. Salcido testified Garcia's eyes were red and his breath smelled of alcohol. From a nursing point of view, Salcido formed an opinion, from observing Garcia, that he appeared intoxicated. Having already determined that Garcia did not have neurological damage, Salcido testified she believed Garcia's slurred speech and behavior was due to intoxication and not from any injury. Sean Petty, also working a shift as an EMT at Del Sol, assisted with the transfer of Garcia from the ambulance stretcher to the hospital stretcher. Petty testified he observed that Garcia's eyes looked "sluggish," he had a strong smell of alcohol on his breath, slurred speech, and was very confused and asked repetitive questions. Eventually, Garcia was released into Officer Rodriguez's custody and transported to the police station.

*The Trial*

At trial, several other law enforcement and medical officials testified. Several employees of the bars where Garcia was drinking that night, specifically, the waitresses who had served Garcia, testified to his intoxication and behavior on the night of the collision. Dozens of photographs of the crime scene and medical record documentation were admitted into evidence, as were photographs of Joshua, Isaiah, and Shannon, with their respective loved ones, which were taken before the collision.

Also admitted into evidence were jail phone call recordings, in which Garcia discussed his ability to "drive well" on prior occasions when he had been intoxicated.

At the close of evidence, the jury found Garcia guilty of three counts of intoxication manslaughter. The jury assessed punishment on each conviction at sixteen and a half years confinement. Subsequently, when assessing punishment, the trial court ordered two of the counts to run consecutively, and the third count to run concurrently. This appeal followed.

## II.      ISSUES ON APPEAL

Garcia presents four issues on appeal, with the first three challenging evidentiary rulings. Garcia asserts the trial court erred when it admitted, over his objection, the following evidence: (1) testimony of a firefighter who quantified his purported level of intoxication at the time of the collision; (2) a written statement from Loera regarding whether Garcia appeared to be intoxicated at the scene of the collision; and (3) one of his jail-call statements. In his fourth and final issue, Garcia asserts he was harmed by the State's jury argument during closing argument, which he claims amounted to an improper plea to a juror.

## III. DISCUSSION

### A. Evidentiary Rulings

In Issues One through Three, Garcia asserts the trial court erred in its admission of certain evidence over his objections.

#### 1. Standard of Review

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). In challenges regarding the admission of evidence, an appellate court will not disturb a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Id*. Accordingly, all three evidentiary issues, will be reviewed under this standard. *See Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007) ("[A] trial court's determination that a prior consistent statement is admissible because the cross-examination suggested or implied an assertion of recent fabrication or improper motive is reviewed only for an abuse of discretion."); *see also Knight v. State*, 457 S.W.3d 192, 201 (Tex. App.—El Paso 2015, pet. ref'd) (extraneous-offense evidence reviewed for an abuse of discretion).

The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We are tasked with determining whether the trial court acted without reference to any guiding rules and principles, or stated otherwise, whether the act was arbitrary or unreasonable. *Id*. at 241-42.

#### 2. Issue One: Admission of the firefighter's assessment of Garcia's purported level of intoxication

In his first issue, Garcia asserts the trial court committed error when it admitted testimony

from a firefighter who quantified Garcia's level of intoxication at the time of the collision. Essentially, Garcia contends the firefighter—a lay witness—should not have been permitted to testify as to the *extent* of his purported intoxication, by means of providing a rating on a scale of 1 to 10, which he argues only expert witnesses are permitted to so provide.

### a. Applicable Law

Rule 701 of the Texas Rules of Evidence provides that a lay witness may testify in the form of opinion so long as the opinions are rationally based on the witness's perception and help in the determination of a fact in issue. TEX. R. EVID.701. If the witness perceived events and formed an opinion that a reasonable person could draw from the facts, the first part of rule 701 is met. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). If the opinion is helpful for the trier of fact or aids in the determination of a fact in issue, the second part of rule 701 is met, and the opinion is admissible. *Id*. It is well established that the opinions of lay witnesses are admissible concerning various subjects, including physical condition and intoxication. *See Denham v. State*, 574 S.W.2d 129, 131 (Tex. Crim. App. 1978) (noting that lay opinion is admissible concerning "sanity, insanity, value, handwriting, *intoxication*, *physical condition* health and disease, estimates of age, size, weight, quantity, time, distance, speed, identity of persons and things") [emphasis added].

### b. Analysis

Garcia asserts the trial court erred by admitting opinion testimony regarding his level of intoxication because, according to him, a witness cannot testify about a person's level of intoxication without first establishing that he or she is an expert. We disagree.

While testifying at trial, El Paso firefighter James Gunther described his involvement in

8

responding to the scene on the night of the collision. When asked to describe his interaction with Garcia, Gunther stated he initially asked him if he was in pain and if he had anything to drink. Garcia responded that he had foot pain and that he had consumed "[f]ive beers and three shots." When asked to describe Garcia's physical condition, Gunther testified his eyes "looked like wet marbles. They were glossy . . . . I could tell that he had some issues going on." The following exchange occurred next between the prosecutor and Gunther, which was soon interrupted by objections from Garcia's counsel:

> Q. [By the State] And based on your observations of [Garcia], did you have an opinion as to whether or not he was intoxicated?
>
> A. [Gunther] Yes.
>
> Q. And what is your opinion?
>
> A. That he was.
>
> Q. Okay.
>
> A. He was AOB. He had a strong hit -- he had a strong smell of alcohol . . . . AOB, alcohol on breath . . . .
>
> Q. . . . Say on a scale from one being tipsy or intoxicated to a small degree, buzzed maybe, and ten being falling over drunk, passed out; how would you quantify him on a scale of one to ten?
>
> [Defense Counsel]: I'm going to object to this form of question, Your Honor, as well as under 702, as well as under relevance and 403.
>
> [The State]: May I respond?
>
> [The Court]: Yes.
>
> [State]: Your Honor, this question isn't being offered under Rule 702. This isn't an expert opinion. I'm asking him for his lay opinion. I'm asking him to the degree that he believes that the Defendant was intoxicated. He's already testified that he believed him to be intoxicated. Now, my question is to what degree, in this witness's opinion, the Defendant was intoxicated.

9

[Defense Counsel]: This goes beyond the scope of what's permitted under 701 in the case law regarding witness's ability to testify as a lay witness, as to their intoxication, as far as a level of intoxication. There's nothing to support that.

[The Court]: Overruled.

Go ahead, [the State].

Q. [By the State] And so Firefighter Gunther, again . . . -- zero being sober, one being somewhat intoxicated and ten being falling over or passed out, very drunk; how would you quantify it in your opinion?

A. [Gunther] Probably an eight if I had to use that.

Garcia now argues this testimony was inadmissible because Gunther was not a qualified expert witness, and therefore, should not have been able to testify about his level of intoxication. Garcia, relying on *Emerson*, claims opinion testimony "about a person's precise level of intoxication must be based upon either a blood test or breath test . . . all of which involve sophisticated scientific machinery and chemicals." *See Emerson v. State*, 880 S.W.2d 759, 768-69 (Tex. Crim. App.), *cert. denied*, 513 U.S. 931 (1994). In this instance, we disagree with Garcia's assertion and find his reliance on *Emerson* to be misplaced.

In *Emerson*, the Court of Criminal Appeals analyzed whether the admissibility of testimony concerning an HGN test qualified as scientific evidence that served as a reliable indicator of intoxication. *Id*. at 765. The Court of Criminal Appeals held the HGN test to be a reliable indicator of intoxication. *Id*. at 768. However, it could not conclude that the HGN technique was a sufficiently reliable indicator of precise blood alcohol content (BAC). *Id*. at 769. Thus, based on *Emerson*, an officer may testify concerning a defendant's performance on an HGN test but may not correlate such performance to a precise BAC based on the angle of onset of nystagmus. *Id*.

10

Responding, the State argues that *Emerson* is distinguishable, and we agree. Here, not only was an HGN test never performed on Garcia, but there were also *no* standard field sobriety tests (SFST) conducted at all. *See Wisdom v. State*, 39 S.W.3d 320, 323 (Tex. App.—Waco 2001, no pet.) (finding *Emerson* inapplicable where the complained of evidence and testimony did not attempt to correlate the appellant's performance on any SFSTs with a precise blood alcohol concentration). Second, the State argues, which we find compelling, that the use of a numerical scale as a basis for comparison in how intoxicated Garcia appeared "did not serve to elevate Gunther's opinion to that of an expert because the jury would have been fully capable of understanding his testimony without the assistance of someone with specialized knowledge." *See Osbourn*, 92 S.W.3d at 537 ("It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert."). Here, Gunther responded to the scene to render aid, and his testimony was based on what he perceived while treating Garcia based on his personal experience of having previously observed intoxicated persons. Because intoxication is an elemental factor of the charged offense, Gunther's testimony, if believed by the jury, was helpful in its determination of a fact issue in the case. Gunther's lay opinion testimony was admissible, and the trial court did not abuse its discretion in admitting it under Rule 701.

Moreover, error, if any, was cured and therefore harmless. At trial, Adrian Palomo, a firefighter who also rendered aid to Garcia, testified to his observations. The following exchange occurred between Palomo and the prosecutor:

> Q. . . . Based on your interactions with this defendant, with Mr. Garcia your patient that evening, did you form an opinion as to whether or not he was intoxicated when you were interacting with him?

11

A. Yes.

Q. Okay. And what is your opinion?

A. He was intoxicated.

Q. Okay. How -- to what degree would you say that he was intoxicated?

A. From a scale of one to ten?

Q. Sure.

A.  About an eight.

Moreover, Steven Anaya, a registered nurse who interacted with Garcia in the emergency room, had a similar exchange with the prosecutor:

Q. In the five minutes that you spent with [Garcia], did you have an opportunity to say or to form an opinion as to whether or not he was intoxicated?

A. That was apparent to me the minute I smelled the alcohol and the odor grew . . . stronger as I got closer. And as he was speaking with me it was clear that it was on his breath, and as well as the slurred speech. It was quite apparent.

. . .

Q. And so on a scale of one to ten . . . how would you quantify his degree of intoxication in your opinion?

A. I would say it was at least a six.

In our view, the testimony of firefighter Palomo and nurse Anaya are essentially the same as Gunther's. Both Palomo and Anaya quantified Garcia's intoxication on a scale of one to ten, without objection. Because Garcia failed to object to Palomo's and Anaya's testimony as to how intoxicated Garcia appeared on a scale of one to ten, any error in the admission of Gunther's lay opinion was cured, and therefore harmless. *See Valle v. State,* 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (finding "An error in the admission of evidence is cured where the same evidence

12

comes in elsewhere without objection.").

Accordingly, Garcia's first issue is overruled.

### 3. Issue Two: Admission of witness Loera's written statement

In his second issue, Garcia asserts the trial court erred when it admitted witness Jennifer Loera's on-scene written statement (State's Exhibit 34), as a prior consistent statement under Rule 801(e)(1)(B) of the Texas Rules of Evidence. We disagree.

#### a. Applicable Law

Texas Rule of Evidence 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements that are "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Hammons*, 239 S.W.3d at 804 (citing TEX. R. EVID. 801(e)(1)(B)). As explained by the Texas Court of Criminal Appeals, this Texas Rule of Evidence mirrors that of Federal Rule of Evidence 801(d)(1)(B). *Id*. (citing FED. R. EVID. 801(d)(1)(B)). Consequently, *Hammons* instructs that federal decisions provide helpful analysis of Texas Rule of Evidence 801(e)(1)(B) and its federal counterpart. *Id*. As *Hammons* notes, the federal rule has been interpreted by the United States Supreme Court as providing that four requirements must be met for prior consistent statements to be admissible: (1) the declarant testifies at trial and is subject to cross examination; (2) there is an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent offers a prior statement that is consistent with the declarant's challenged in-court testimony; and (4) the prior consistent statement is made prior to the time that the supposed motive to falsify arose. *Id*. (citing *Tome v. United States*, 513 U.S. 150, 156-58 (1995)). With either rule, there is a minimal foundation requirement of an implied or express charge of fabrication or

13

improper motive; "there need be only a suggestion" that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with that testimony at trial. *Id*. The fact that there need only be a suggestion of alteration or fabrication affords the trial court substantial discretion in admitting prior consistent statements under 801(e)(1)(B). *Id*. at 804-05. Because there is no bright line rule, the ultimate inquiry for an appellate court is to determine whether the cross-examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate. *Id*. at 805.

### b. Analysis

Garcia maintains admission of the prior consistent statement was inadmissible hearsay because it was not offered for the purpose of rebutting a charge of recent fabrication or improper influence or motive. On the night of the collision, Loera, a witness to the collision, gave two statements to authorities—a video-recorded interview and a written statement. The recorded statement was admitted into evidence and played for the jury, and the written statement was also admitted into evidence and read to the jury.

While still on scene, Loera provided a written statement to authorities in which she stated, "driver [Garcia] seemed drunk and was worried about his car. . . ." While still on scene and after providing her written statement, Loera offered a second statement, which was video recorded. In her recorded statement, Loera did not mention Garcia's purported intoxication.

On cross-examination, the following exchange between Loera and defense counsel occurred:

> [Defense counsel]: I'd like for you to do me a favor, Ms. Loera. I'd like for you to look through there [a transcription of her video-recorded statement] and I'd like for you to find where you say, I saw the driver of the vehicle and he appeared to be intoxicated. Please find it.

14

[State]: Your Honor, I'm going to object. He's missing part of the statement. She gave two statements that night. This is the other half of her statement.

[Defense counsel]: I'm asking about that right there right now. I'm going to get to that in a second.

[The Court]: Overruled for now . . . .

. . .

[Defense counsel]: In that video recorded statement, where do you say that [Garcia] appeared -- he appeared to me, Jennifer Loera, to be drunk or intoxicated or *borracho*?

[Loera]: It's not on here. They didn't ask me that.

On re-direct, the State sought to admit Loera's written statement as a prior consistent statement under Rule 801(e)(1)(B) of the Texas Rules of Evidence. A bench conference followed, and the State argued the statement would rebut the impression defense counsel left with the jury that Loera never told authorities, while on scene, that Garcia was drunk. Defense counsel denied he had implied Loera changed her testimony and asserted that he only intended to point out that Loera's "recollection at that time was flawed." When questioned by the prosecutor, Loera confirmed she had formed the opinion that Garcia "looked drunk," and that is what she said on the night of the collision.

On appeal, the State counters, arguing defense counsel's questions asking Loera how many times she met with prosecutors before trial, whether she had consumed alcohol before giving her statements, whether she had bought alcohol for Renteria—who was underage—and whether she thought she was sober enough to drive, all implied that Loera had recently fabricated her trial testimony because she did not want to be prosecuted for driving while intoxicated or for purchasing alcohol for a minor. At trial, defense counsel also asked Renteria whether prosecutors had told her

15

she would not be prosecuted for consuming alcohol while underage, and whether she had been afraid of getting in trouble for consuming alcohol. In his closing argument, defense counsel argued that the first time Loera stated Garcia appeared intoxicated was at trial—after meeting with prosecutors.

We agree with the State and find the record supports that Loera's written statement was offered to rebut an implied charge of recent fabrication. We find the trial court's assessment of defense counsel's tenor and questioning reasonably deduces that the totality of the cross-examination implied that Loera's trial testimony of Garcia seeming intoxicated was a recent fabrication of her written testimony. We therefore find the trial court did not abuse its discretion in admitting the written statement. *See Hammons*, 239 S.W.3d at 808 (finding, although the questioning was subtle, the force of the cross-examination and the tone and tenor of the questioning, combined with the purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the trial court, the trial court did not abuse its discretion in concluding appellant was making an implied charge of recent fabrication during cross-examination).

We further agree with the State that Loera's written statement was properly admitted to correct the false impression that she never told officers at the scene that Garcia appeared intoxicated. As already established, we find that defense counsel's cross-examination of Loera created a false impression that she did not tell authorities that Garcia appeared intoxicated at the scene. Loera's written statement, which stated Garcia appeared intoxicated, proved she told authorities at the scene that Garcia appeared intoxicated, and was thus properly admitted to correct

16

the false impression created by defense counsel during cross-examination.[2]

The trial court did not abuse its discretion in admitting Loera's written statement. Accordingly, Issue Two is overruled.

### 4. Issue Three

In his third issue, Garcia argues his jail-call statement (State's Exhibits 72 and 72A)[3] should not have been admitted because it contained improper character evidence and constituted inadmissible prior bad act evidence pursuant to Texas Rules of Evidence 403 and 404.

### a. Applicable Law

Evidence of extraneous offenses or prior bad acts is generally inadmissible during the guilt-innocence phase to establish a defendant acted in conformity with his character by committing the charged offense. *Knight*, 457 S.W.3d at 202. However, evidence of extraneous offenses or prior bad acts may be admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). This list is neither mutually exclusive nor collectively exhaustive. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). When a defendant raises a defensive theory, he "opens the door" for the State to offer rebuttal testimony in the form of an extraneous offense if the extraneous offense has common characteristics with the offense for which the defendant was on

---

[2] We also agree with the State that Loera's written statement was properly admitted under the rule of optional completeness. Defense counsel was relying on only half of Loera's statements to authorities at the scene, and pursuant to the rule of optional completeness, the State was entitled to correct the false impression by offering the written statement in which she told police Garcia appeared intoxicated. The rule of optional completeness is a recognized exception to the hearsay rule that allows the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party. TEX. R. EVID. 107; *see Walters v. State*, 247 S.W.3d 204, 217-18 (Tex. Crim. App. 2007).

[3] State's Exhibit 72 is a recording of a jail call wherein Garcia and the other participant speak in Spanish, while State's Exhibit 72A is a written translation of the call.

trial. Rule 404(b) permits the admission of extraneous-offense evidence to prove elemental facts of the charged offense. *See Werner v. State*, 412 S.W.3d 542, 549 (Tex. Crim. App. 2013); *see also Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("A defendant's conduct after the commission of a crime which indicates a consciousness of guilt[] is admissible to prove that he committed the offense. . . . Texas courts recognize consciousness of guilt as an exception to rule 404(b)'s general prohibition against evidence of extraneous offenses.") [internal quotations omitted].

### b. Analysis

Garcia references State's Exhibits 72 and 72A, arguing his statement that he had driven drunk in the past contained "<u>zero</u> probative value outside its value as inadmissible prior bad act evidence." He further maintains the balancing test for prior bad act evidence is only applicable when the prior bad act evidence is being offered for some other reason, which in this case, it was not, because the State offered it as an admission of guilt.

At trial, before opening statements, Garcia objected to the admission of his statement, "I have been drunk and I still drive well," contained in a jail phone call recording. The objection was on the basis of Rules 403 and 404 of the Texas Rules of Evidence, which the court overruled. Garcia renewed his objections during trial when State's Exhibit 72—the jail phone call statement, "I have been drunk and I still drive well,"—was admitted into evidence and published to the jury.

### i. Rule 404

The State counters by arguing the statement falls within the exceptions listed in rule 404(b) and was offered to prove an elemental fact of the charged offense. Additionally, extraneous-offense evidence may be admissible if the accused, through an opening statement or cross-

examination, "opens the door" to the admission of such rebuttal evidence. *See De La Paz*, 279 S.W.3d at 343. The State, both at trial and now on appeal, maintains the complained-of statement was in no way used to show Garcia acted in conformity with his character on the night of the accident. Rather, the State argues, the statement, "I have been drunk and I still drive well," when considered in the context with the subsequent statement, ". . . but this time I don't know why all of a sudden my mind went blank," was tantamount to an admission of guilt that he was intoxicated in *this* instance—an element of the charged offense.

In this instance, we agree with the State that if the trial court had not admitted the complained-of statement, the jury would have been prevented from interpreting Garcia's admission of being intoxicated *this* time. We find the complained of statement provided necessary context to Garcia's admission of guilt that he was intoxicated *this* time, which is an element of the charged offense. *See Werner*, 412 S.W.3d at 549 (holding that rule 404(b) permits the admission of extraneous-offense evidence to prove elemental facts of the charged offense); *see also Hedrick*, 473 S.W.3d at 830 (holding that Texas courts recognize "consciousness of guilt" as an exception to rule 404(b)'s general prohibition against extraneous-offense evidence).

Furthermore, we also agree that Garcia opened the door to his own admission by suggesting other, non-intoxication-related causes for the crash, such as Garcia being distracted, falling asleep, or the possibility of a head injury. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (a defense opening statement may open the door to the admission of extraneous-offense evidence to rebut a defensive theory presented in that opening statement); *Wingfield v. State*, 197 S.W.3d 922, 925 (Tex. App.—Dallas 2006, no pet.) (finding that vigorous cross-examination can, by itself, place in issue a non-conformity purpose under rule 404(b)).

### ii.     Rule 403

Rule 403 also favors admission of the complained-of statement. In a rule 403 analysis, courts must balance: (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the fact finder from the main issues, (5) any tendency of the evidence to be given undue weight by a fact finder that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *See Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

The statement was relevant as an admission that Garcia was intoxicated at the time of the collision and to rebut his defensive theory of other, non-intoxication-related causes for the crash and visible signs of intoxication that witnesses had testified to. *See Zuliani v. State*, 903 S.W.2d 812, 824 (Tex. App.—Austin 1995, pet. ref'd) ("a confession is like no other evidence as it comes from the actor himself and is the most probative and damaging evidence that can be admitted against a defendant"). Also, it is important to emphasize the State did not argue, or insinuate, that the jury should convict Garcia because he had driven drunk in the past, but rather, it argued the statement was necessary to convey to the jury that Garcia admitted he was intoxicated *this* time. We find the probative value of the statement did not substantially outweigh any danger of unfair prejudice.

Even if the trial court erred in the admission of the statement, we further conclude the error was cured by the admission of essentially the same statement admitted in another jail phone call

20

recording. In State's Exhibit 72—the complained-of statement—Garcia said, "I have been drunk and I still drive well . . . but this time I don't know why all of a sudden my mind went blank." This statement was admitted into evidence. In State's Exhibit 74—the statement we find substantially similar to the complained-of statement—Garcia said, "That [] day, me [] and Kike went drinking, and I'm telling you, man I don't know how . . . I mean . . . I've been drunk and I still drive well, right? . . . I mean, I don't understand how I blacked out, man. All of a sudden." This statement was also admitted into evidence and Garcia did not object to the admission of the similar statement in his opening briefing on appeal. In Garcia's reply brief, he argues, for the first time, the fact that he did not explicitly point to the particular exhibit in his initial brief does not mean the objection was not referenced and it thus "defies reason" to conclude otherwise. Aside from the absence of an explicit objection to the similar statement, throughout his initial brief, Garcia repeatedly refers to the complained-of statement in the singular, and it is not our impression that his appellate objection referred to both jail phone call statements admitted at trial. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Nonetheless, because we find the two statements substantially similar, we find the trial court did not abuse its discretion in admitting either of the jail-call statements—State's Exhibits 72, 72A, 74, 74A.

Accordingly, Issue Three is overruled.

## B. Improper Jury Argument

In his fourth and final issue, Garcia claims the trial court erred in not sustaining his objections to improper jury argument. Specifically, Garcia complains he timely objected to the prosecutor speaking directly to a juror and imploring her to rely upon her own expertise as a nurse

(i.e., evidence not received during the trial), as opposed to only the evidence presented at trial.

### 1. Applicable Law and Standard of Review

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). It is well recognized that proper jury argument falls within four areas: (1) a summation of the evidence, (2) reasonable deductions from the evidence, (3) answer to argument of opposing counsel, and (4) a plea for law enforcement. *Id.*; *Hernandez v. State*, No. 08-98-00016-CR, 2001 WL 9929, at *6 (Tex. App.—El Paso Jan. 4, 2001, pet. ref'd) (not designated for publication). The focus has always been upon encouraging the jury to decide the case on the evidence in front of it rather than encouraging juries to reach a decision based upon information outside the record. *Milton*, 572 S.W.3d at 240.

When examining challenges to jury argument, reviewing courts consider the remark in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). Counsel is allowed wide latitude, without limitation in drawing inferences from the evidence, so long as the inferences are reasonable, fair, legitimate, and offered in good faith. *Id.* To constitute error, the jury argument must be extreme or manifestly improper, or inject new and harmful facts into evidence. *Id.* Generally, the bounds of proper closing argument are left to the sound discretion of the trial court. *Milton*, 572 S.W.3d at 240.

Generally, erroneous rulings related to jury argument are treated as non-constitutional error within the purview of TEX. R. APP. P. 44.2(b). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000). Improper jury argument is not reversible if it is merely harmless. *Mosley v. State*, 983

22

S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc). Because harmless error does not warrant reversal, we must consider three factors in our analysis, if error is found: (1) the severity of the misconduct (i.e., the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (i.e., the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (i.e., the strength of the evidence supporting the conviction). *Id.*

## 2. Analysis

At trial, evidence was introduced that Garcia generally complained of only foot pain and those providing aid testified they saw no visible head injuries. Evidence also established Garcia had a Glasgow Coma Scale ("GCS") score of 15, which tended to show he had no neurological deficits or disorientation. Jamie Salcido, a registered nurse who treated Garcia on the night of the collision, testified that after ruling out neurological damage based on the GCS score, "the only other way that [Garcia] would be, you know, with unbalanced, slurred speech, smelled of alcohol is because he's been drinking." During closing argument, while referencing Salcido's testimony, defense counsel argued, "[a]bout an hour after the accident: Neurologic, alert, oriented times three, normal speech, no motor deficits. That's reasonable doubt." Reading from Garcia's medical records and referring to his GCS score, defense counsel further stated, "Motor, normal, sensory, normal. But if you look right here at the bottom: Gaze, normal. That's reasonable doubt."

Responding to defense counsel's argument during its closing, the prosecutor argued:

[State]: . . . I want to point out the medical records. I want to take you back to Jamie Salcido's testimony. She says it. She says -- [defense counsel] is misconstruing her testimony. And I'm looking at you because I know you're my nurse. He is misconstruing her testimony.

[Defense]: Your Honor, I'm going to object to that last comment. She's inviting

23

one of the jurors who's a nurse to draw on her -- things that are not in evidence and they're instructed not to do that.

[Court]: Overruled.

On appeal, Garcia argues the trial court erred when it overruled his objection to the prosecutor's attempt to appeal to a specific juror, a nurse, to consider her own expertise when evaluating testimony that came from a witness who was also a nurse. On review of the State's closing argument in context, we disagree. Although the prosecutor stated she was looking at one of the jurors because she knew she was a nurse, the record does not establish the prosecutor advised the nurse-juror to use her expertise in evaluating the evidence. After the remark was objected to, the prosecutor focused her argument on Salcido's testimony, in which Salcido explained that after ruling out neurological injuries, she believed Garcia's signs of intoxication were due to him being intoxicated. Remaining within permissible areas of argument, the prosecutor answered opposing counsel's argument referencing medical findings which had ruled out neurological deficits, and further asserted reasonable deductions from the evidence. *See Milton*, 572 S.W.3d at 239 (proper jury argument consists of: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement; and a trial court does not abuse its discretion in overruling an objection where the complained-of argument simply calls upon jurors to use their common sense and was a reasonable deduction from the evidence). The State remained within the bounds of permissible argument by arguing that defense counsel had misconstrued Salcido's testimony in an attempt to establish reasonable doubt.

We further conclude that even if the trial court erred in overruling Garcia's objection, any such error was harmless. In conducting the harm analysis under *Mosley*, we find the three factors favor the State. *Mosley*, 983 S.W.2d at 259 ((1) the severity of the misconduct (the magnitude of

24

the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)).

### a. First *Mosley* Factor

Again, we find it notable that the prosecutor did not expressly direct the nurse-juror to use her expertise, and following Garcia's objection, the remainder of her argument was proper. We agree with the State and find the prosecutor's remarks led to, if at all, an ambiguity. *See Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011) (finding that courts should view the State's alleged improper argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being permissible). When reviewing the remark in context, the prejudicial effect of the prosecutor's remarks was slim to none, considering the prosecutor called upon the jurors to use their common sense, not their expertise. We do not find the statement extreme enough to warrant automatic reversal. The first factor does not weigh in Garcia's favor.

### b. Second *Mosley* Factor

The jurors were repeatedly instructed by the trial court and the State that the only evidence they were allowed to consider was evidence properly admitted. At the commencement of trial, after the jury was seated, the court provided the following instruction:

> Do not tell other jurors your own personal experiences or other people's experiences. For example, you may have special knowledge of something in the case such as business, technical, or professional information. You may even have expert knowledge or opinions . . . Do not tell jurors about it. Telling other jurors about it is wrong because it means the jury will be considering things that were not admitted in court.

After Garcia objected to the alleged improper jury argument, the prosecutor summarized Salcido's testimony, made reasonable deductions from that evidence, and responded to opposing

counsel's argument as follows:

> [State]: They are looking for physical, neurological injuries on [Garcia]. And just like we've seen it countless times, our drunk is fine. [Salcido] says that there is no neurological damage. He doesn't have injuries that would cause him to be acting the way he's acting. She says specifically that the reason he's acting the way he's acting has to be because of something else because it's not due to his neurological functions. It's not due to injuries from the car crash. She's saying based on his demeanor, based on his smell, that the only reason he is acting this way is because he's intoxicated . . . . There is a difference, what they are evaluating, whereas what we are evaluating as a criminal system.

Moreover, in its charge to the jury, the trial court instructed as follows:

> The evidence consists of the testimony and exhibits admitted in the trial. You must consider only the evidence admitted to reach your decision. You must not consider, discuss, or mention anything that is not admitted as evidence in the trial. You must not consider or mention any personal knowledge or information you may have about any fact or person connected with this case that is not evidence in the trial.

We find the court provided ample instructions to the jury to cure the error, *if any*, and the record contains no evidence to suggest the nurse-juror necessarily relied on her expertise. The second factor does not weigh in Garcia's favor.

### c. Third *Mosley* factor

Lastly, we view the evidence of Garcia's intoxication as being overwhelming, while there was no contrary evidence supporting any indication of neurological injury. Several witnesses testified to Garcia's intoxication, and that he only complained of foot pain—among these witnesses the record includes: Loera and Renteria, Gunther, Officer Rodriguez, Salcido, as well as other medical professionals who were involved in Garcia's treatment, as well as employees who worked at the bar and testified to having served Garcia alcohol before the collision. The medical records also prove he suffered no neurological damage—specifically, his GCS score of 15. It was reasonable for the jury to deduce that Garcia's bloodshot eyes, slurred speech, and smell of alcohol

on his breath, among other signs of intoxication, were due to him being intoxicated on the night of the collision. On this record, the certainty of conviction absent the purported misconduct is strong. Thus, the third factor weighs heavily against Garcia.

In sum, even if the trial court erred in overruling Garcia's objection, any such error was harmless. Garcia's fourth issue is overruled.

## IV.    CONCLUSION

For all the foregoing reasons, we affirm.


GINA M. PALAFOX, Justice

October 20, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

27