**Opinion filed December 18, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00033-CR

_____

## CHARLES JOHNSON A/K/A CHARLES DANIEL JOHNSON, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause No. CR29721**

## M E M O R A N D U M   O P I N I O N

Appellant, Charles Johnson a/k/a Charles Daniel Johnson, Jr., was convicted by a jury of stalking, a third-degree felony. *See* TEX. PENAL CODE ANN. § 42.072(a), (b) (West Supp. 2024). Appellant pled "true" to the enhancement allegation—Appellant's prior felony conviction involved the same offense as charged in this case and the same victim—and the jury assessed his punishment at imprisonment in the

Institutional Division of the Texas Department of Criminal Justice for twenty years and a $10,000 fine. *See id.* § 12.33 (West 2019), § 12.42(a).

In four issues on appeal, Appellant contends that: (1) his right to a unanimous jury verdict was violated; (2) the trial court's charge impermissibly allowed a conviction based on conduct not "specifically directed at" Melissa Murray, the victim named in the indictment; (3) a variance between the charging instrument and the proof at trial of a "material non-statutory allegation" rendered the evidence legally insufficient to support his conviction; and (4) the jury's guilty verdict "is not supported by sufficient evidence because not all of [Appellant's] course of conduct relied upon to convict was 'directed specifically toward the complainant' in [the] indictment." We affirm.

## I. *Factual Background*

Appellant's relentless pursuit of Murray began as an uninvited interaction in 2006, while they were parishioners of Victory Life Church[1] in Brownwood. Murray was an active volunteer from 2003 until she was hired as a full-time worship leader in 2008. Even after she transitioned to a career in clinical social work in 2017, Murray continued to volunteer on the church's worship team through 2021. Her first interaction with Appellant, who is over ten years her senior, was in May 2006 during her volunteer shift at the church's radio station. Murray testified that "he was kind of upset," so Murray offered to pray for him. When Murray turned twenty-three later that month, Appellant gave her flowers and a toy tiara, which she found "really bizarre," "weird," and "kind of creepy." But Appellant declared himself to be on a mission—he believed that "God put [Murray] in [his] dreams," and that their union was preordained.

---

[1]Prior to 2006, Victory Life Church was called Living Word Church. There are twelve campuses under the Victory Life Church banner as well as the online campus. Because the location in Brownwood is where most of the relevant events occurred, we will refer to that location as "Victory Life Church" or "the church," and explicitly distinguish other campuses for clarity.

Murray politely declined Appellant's propositions, ignored the notes he left on her car, avoided him when he waited for her after services, and sometimes hid when she saw him approaching. Murray's family members, other parishioners, and church staff intervened upon observing Appellant's obsessive behavior, and demanded that he respect Murray's boundaries. Emboldened by discouragement, Appellant construed Murray's rejection as a spiritual test. As Murray walked to her car one night after an event at the church, Appellant accosted her in a "very threatening" manner and asked, "What do you want from me? Do you want to marry me?" Murray "felt very attacked" by Appellant's aggressiveness.

In June 2008, Murray called the police when she noticed Appellant following her as she ran errands. Chief David Mercer with the Early Police Department spoke to Murray and observed that she "was very scared." He then found Appellant and informed him "that he needed to avoid [Murray] and to quit contacting her." Chief Mercer perceived that Appellant "did not believe in the laws set forth by the . . . government"—"it was only a matter of what God wanted for him and [Murray]." In the days that followed, the Brown County Sheriff's Office issued a criminal trespass warning that prohibited Appellant from being on church premises. Appellant went to the church a week later with an engagement ring intended for Murray, and he was arrested for trespassing.

Appellant was indicted for stalking Murray in January 2009; he pled guilty in March 2009 and was placed on deferred adjudication community supervision. When he continued to contact Murray in violation of his conditions of community supervision, he was adjudicated guilty in November 2009 and sentenced to ten years' imprisonment. In a letter to fellow parishioner Dusty Wilson and her husband, Appellant reflected on his adjudication hearing: "I would rather be in prison than just walk away from God[']s plan for my life. . . . [O]ne thing I couldn't do was just walk away." He maintained his innocence and recalled "get[ting] to see [Murray]

3

and ask her why she was so afraid." Wilson later revealed that she "did not know what to do with [the] information" in Appellant's letter: "I felt like, okay, this is still going on. It really hurt my heart for [Appellant] and for [Murray] . . . it scared me." Murray likewise felt "scared," "violated," and "harass[ed]" upon receiving Appellant's letters that he sent to her home address. From prison, he wrote "that God told him that [they] were supposed to be together" in a dream, and "he hoped eventually [she] would see it."

When Appellant was released on parole in June 2016, he purchased another engagement ring, attempted to connect to Murray through social media, and joined Victory Life Church's online campus. As a member of the online church, Appellant viewed prerecorded and livestreamed worship services and engaged in online discussions with assistant pastors. According to Dr. Craig Smee, the online campus pastor from 2016 to 2020, Appellant's virtual exchanges "followed the same pattern over and over again"; he steered every conversation toward Murray and stated how she was "somebody that he was supposed to have." Dr. Smee counseled Appellant to seek a relationship with God rather than with Murray and advised him to find another church. Dr. Smee surmised that Appellant "wasn't [t]here just to deepen his relationship with God" but instead to only gain access to Murray, so he removed Appellant from the online platform.

Appellant trespassed onto Victory Life Church property in November 2017, and his parole was subsequently revoked. He resumed writing letters to Murray and the church while incarcerated. In March 2020, he asked Murray for forgiveness and promised to "respect[] [her] as an individual and as a woman." Yet in July 2020, he wrote a letter to the church referring to his dreams as a message from God about Murray. Dr. Smee, who became the lead pastor of the church in August 2020, read a "[s]ignificant amount[]" of letters from Appellant in which Appellant expressed his genuine belief that being with Murray "is God's calling."

4

Appellant was released from prison in mid-2020 no less resolute that Murray was "supposed to be [his] wife." For a few months, he was content to watch the online services that frequently featured Murray on the worship team. But those ultimately failed to satisfy his "longing for purpose and direction." On the morning of Sunday, September 6, 2020—when it was highly likely that Murray would have been leading worship[2]—he walked inside the church. Church "safety team"[3] members, Troy Henderson and Tommy Valencia, quickly intercepted Appellant and escorted him from the church. Valencia, who had known Appellant for nearly eighteen years, advised Appellant to "stay away out of love for [Murray]" because she did not want to marry him. Appellant's defiance concerned Valencia— Appellant refused to accept Murray's feelings because, in his mind, "that's not the way it's supposed to be." Valencia "finally talked [Appellant] into getting in his car and leaving" without involving law enforcement.

Murray was granted a lifetime protective order in December 2020 that prohibited Appellant from being within 500 yards of her, her residence, and Victory Life Church. Although Appellant kept his distance until July 2021, he called the church office incessantly in the interim. In July 2021, he called after he saw Murray's sister, Angela Bishop, on stage during a livestreamed worship service. He confused Bishop for Murray, noticed that Bishop was wearing her wedding ring, and he called the church office to inquire whether Murray was married. Appellant subsequently explained that he "was just curious . . . [w]hether or not [Murray] was married," so that he "could drop [her] out of [his] life, [his] mind, [his] head."

---

[2]Troy Henderson testified that Murray was not at the church that day, but Leann Smee and Dr. Smee testified that Murray was there most Sunday mornings as a worship leader who is "very involved in the entire team."

[3]Church leaders assembled parishioners—some with law enforcement experience—to act as security for the protection and safety of everyone on the church's property.

Appellant went to the church on July 18, August 22, and August 25, 2021. Valencia's conversation with Appellant on July 18 "was almost a replay" of their exchange in September 2020. Valencia told Appellant that he was not allowed on church property, in which Appellant retorted, "Isn't this a church? . . . Aren't people welcome here?" Appellant believed that Murray was "supposed to be [his] wife." Valencia again convinced Appellant to leave without calling the police but sensed a growing discomfort and danger during this interaction.

Appellant approached the church entrance on Sunday afternoon, August 22, 2021. He interrupted a women's bible study group to inquire whether any pastors were present. The group leader met him at the front door and sensed an unpleasant tension from Appellant's "cocky manner." She informed him that all pastors had left for the day, then locked the doors when Appellant walked away because she "just didn't get a good vibe."

Appellant's final unlawful visit to the church was three days later, on Wednesday, August 25. Dr. Smee alerted the safety team when he saw Appellant enter the crowded lobby before a service. Valencia, disappointed and frustrated with Appellant, once again escorted him from the church and told him: "You can't be here. . . . [Y]ou've got to stay away from here. This is not good for you. This is not good for [Murray]. This is not good for anyone here." Their discussion was "[b]asically the exact same thing"—Valencia recounted his concern:

> I'm to the point where I worry about my safety, the safety of the people around us, the safety of [Murray]. You know, you hear all kinds of things that happen, you see things on TV, and that stuff plays in your head, and you go, man, when is this gonna stop? . . . [I]t's just reached the point where . . . it's got to stop.
>
> . . . .
>
> [Appellant] persists and persists, and you just -- you have to draw a line somewhere. . . . I just don't want to see things escalate worse.

6

Appellant again conceded that he was not permitted on church premises. When he was arrested that day, he had the engagement ring that he bought in 2016 while on parole.

Based on Appellant's unauthorized appearances at the church between September 6, 2020, and August 25, 2021, and his phone call to the church in July 2021, Appellant was indicted, for the second time, for stalking Murray. At trial, he invoked his right to self-representation and proceeded pro se.[4] The State presented fifteen witnesses, three of whom Appellant recalled during his case-in-chief, including Murray. Appellant then presented twelve additional witnesses before testifying.

Murray testified that Appellant's conduct has caused her "a lot of psychological anguish," that she feared he would kidnap, rape, kill, or hurt her or her family, and she referred to specific instances of Appellant's aggression. Murray still "look[ed] over [her] shoulder all the time." While questioning Murray, Appellant implied that her perception of his aggression was irrational and incorrect. Murray responded:

> I still have a lot of fear of you. . . . I've asked you to leave me alone more than once, repeatedly to your face, it may have been years ago, but I did it multiple times, you haven't listened to a word I've said. Multiple church members and my family have told you the same thing, and you haven't listened to a word they've said.

Murray emphasized that Appellant continued writing and sending letters to her, the content of which "remains the same that . . . God has given . . . [him] this dream" that Murray was meant for him. He also sent letters to the church requesting that they be forwarded to Murray. When Appellant suggested that his return to Victory

---

[4]The trial court denied Appellant's first request to proceed pro se. After Appellant reasserted his right to self-representation on the second day of trial, the trial court, after thorough admonishments, granted his request and permitted his court-appointed attorney to sit as standby counsel and assist Appellant, if requested to do so. He is represented by a court-appointed attorney on appeal.

Life Church was unrelated to her, she reminded him that "[t]here's many, many other churches [he] could go to," but he chose the one at which she was heavily involved.

Appellant then recalled Valencia, who restated that Appellant "never relented." Appellant attempted to characterize his version of events as "the Word of God," by comparing a parallel between his conduct and the biblical tale of divine protection in "refus[ing] to bow down to the king."[5]

Appellant presented Stan Roberts, Dr. Smee's predecessor, who was the lead pastor of the church when the criminal trespass warning was issued. Roberts recalled counseling Appellant "many times" to leave Murray alone, and he "had to get blunt about it." But, due to Appellant's recalcitrance, Roberts staged an intervention by gathering a group of men to dissuade Appellant from further pursuing Murray. Even those efforts were futile. During a subsequent discussion, Appellant told Roberts that: Murray "just doesn't understand, [that he's] got to get her by herself, [he's] got to get her away from all this to where it's just [him] and her, and she can understand." At that point, Roberts "felt it was [his] responsibility to protect [Murray]" because it "was getting scary."

Roberts's wife, Kathy Roberts, explained that the church supported the issuance of the criminal trespass warning because Murray, who was a staff member at the time, "was so adamant and actually fearful" of Appellant. After the criminal trespass warning was issued, Roberts advised the safety team that Appellant was barred from church property.

Appellant was the final witness during the guilt/innocence phase of trial, and he did not dispute that he went to the church in violation of the protective order and criminal trespass warning. He testified: "I am not refuting the fact that I went to the

---

[5]The story is from Chapter 3 of the Book of Daniel: Three Israelites, Shadrach, Meshach, and Abednego, were cast into a blazing furnace after they refused to bow to King Nebuchadnezzar's golden idol. *Daniel* 3:3-23. When the three men emerged miraculously unharmed, even the king proclaimed it as evidence of divine deliverance. *Daniel* 3:24-29.

8

church that I wasn't supposed to go to." Appellant also acknowledged that he scared Murray in the past. In a 2018 letter to Murray, he wrote that he "noticed fear on [her] face" in 2008 when he followed her in a store, which, he claimed, was "why [he] never went near [her]" again. He further testified that "[n]obody ever told [him] what to do, except for God," and he "always followed the law of love." Appellant fervently denied any wrongdoing throughout trial and maintained that "[n]o [] human authority ought in any case to interfere with matters of religion." In addition to rationalizing his behavior against Murray, he argued that Murray "was not [his] overriding purpose or [his] main focus ever, ever. . . . [He] had already let it go."

## II. *Legal Sufficiency of the Evidence and Variance*

Appellant asserts in his fourth issue that the evidence is legally insufficient to support his stalking conviction because the State failed to prove beyond a reasonable doubt that his conduct was "directed specifically" at Murray. In his third issue, he argues that there was a material variance between the indictment and the proof at trial that rendered the evidence legally insufficient to support his stalking conviction. In support of each issue, Appellant emphasizes that Murray was the victim alleged in the indictment, whereas the evidence showed that his unlawful conduct was perpetrated against the church.

### A. *Standards of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d

756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

In conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "We do not sit as the thirteenth juror, and we do not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence." *Fraser v. State*, No. PD-0964-24, 2025 WL 2543457, at *2 (Tex. Crim. App. Sept. 3, 2025) (citing *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023)). "[T]he jury may use common sense, common knowledge, personal experience, and observations from life when drawing inferences." *Id.* (citing *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014)). In this regard, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. Thus, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and

circumstantial evidence equally, and we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

"We measure the sufficiency of the evidence against the hypothetically-correct jury charge, defined by the statutory elements as modified by the charging instrument." *Edwards*, 666 S.W.3d at 574 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically-correct jury charge is one that accurately states the law, is authorized by the indictment, does not increase the State's burden of proof, and adequately describes the offense with which the defendant is charged." *Id.* at 574–75. "When a Texas statute lists more than one method of committing an offense or definition of an element of an offense, and the indictment alleges some, but not all, of the statutorily listed methods or definitions, the State is limited to the methods and definitions alleged." *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018).

"A variance occurs when the proof at trial differs from the allegations in the charging instrument." *Delarosa v. State*, 677 S.W.3d 668, 680 (Tex. Crim. App. 2023) (citing *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001)). A variance that prejudices a defendant's substantial rights is deemed "material," and will render the evidence in support of the conviction insufficient. *Ramjattansingh*, 548 S.W.3d at 547. This occurs "when the indictment, as written, 1) fails to adequately inform the defendant of the charge against him, or 2) subjects the defendant to the risk of being prosecuted later for the same crime." *Id.* Variances involving immaterial non-statutory allegations do not render the evidence legally insufficient provided "they are not so great that the proof at trial 'shows an entirely different offense' than what was alleged in the charging instrument." *Id.* (quoting *Johnson v. State*, 364 S.W.3d 292, 295 (Tex. Crim. App. 2012)).

11

B. *Governing Law & Application*

Section 42.072 requires proof that the defendant knowingly engaged in the offending conduct "pursuant to the same scheme or course of conduct that is directed specifically at another person." PENAL § 42.072(a)(1)(A). Thus, when evaluating whether the evidence is legally sufficient to support a stalking conviction, we "take into account the unique elements of a stalking offense, a crime that depends upon proof of a pattern of conduct." *Werner v. State*, 412 S.W.3d 542, 549 (Tex. Crim. App. 2013); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.46 (West Supp. 2025) ("[F]acts and circumstances surrounding any existing or previous relationship between the actor and the alleged victim" or a member of the victim's family or household are admissible to aid the factfinder in determining whether the defendant's conduct would cause a reasonable person to experience fear.). Neither direct contact with the victim nor an overt threat of violence is required. *See, e.g.*, *Hansen v. State*, 224 S.W.3d 325, 328 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (A stalking scheme and course of conduct may include conduct that the victim would regard as threatening bodily injury to a family member.); *Hayes v. State*, No. 05-23-01291-CR, 2025 WL 2988740, at *5 (Tex. App.—Dallas Oct. 23, 2025, no pet. h.) (mem. op., not designated for publication). Whether a person's course of conduct amounts to stalking is necessarily a fact-specific inquiry. *See, e.g.*, *Sisk v. State*, 74 S.W.3d 893, 898–900 (Tex. App.—Fort Worth 2002, no pet.) (evidence that appellant followed the victim in violation of a protective order was legally sufficient to sustain a conviction for stalking, considering that "the relationship between appellant and [the victim] was at times confusing, confrontational, and tumultuous"). Even acts that are ostensibly lawful when considered in isolation may amount to a course of conduct that constitutes stalking. *See, e.g.*, *Ploeger v. State*, 189 S.W.3d 799, 808–09 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stalking conviction was supported by legally sufficient evidence that the defendant

12

repeatedly sent flowers, letters, gifts, and cards to the victim, and called and went to her mother's place of business).

To sustain Appellant's conviction, the evidence must have demonstrated beyond a reasonable doubt that, on more than one occasion and pursuant to the same scheme or course of conduct that was *directed specifically at another person*—in this case, Murray—Appellant knowingly engaged in conduct that (1) he knew or reasonably should have known that Murray would regard as threatening her with bodily injury or death, (2) caused her to be placed in fear of bodily injury or death, and (3) would cause a reasonable person to fear bodily injury or death. PENAL § 42.072(a)(1)(A), (a)(2), (a)(3)(A); *see Griswold v. State*, 673 S.W.3d 423, 432 (Tex. App.—Dallas 2023, no pet.).

### 1. *The Indictment: No Variance*

We first observe that Appellant failed to identify a variance of any kind between the indictment and the evidence presented at trial. The proof at trial was consistent with the indictment,[6] which alleged that Appellant, on more than one

---

[6]The indictment read:

[Appellant], hereinafter styled Defendant, . . . on more than one occasion:

Did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at Melissa Murray, hereafter styled the complainant, on or about the 6th day of September, 2020, knowingly engage in conduct that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury or death to the complainant, namely going within 500 feet of Victory Life Church or violating a criminal trespass warning, and the defendant's conduct would cause a reasonable person to fear bodily injury or death, and the defendant's conduct caused the complainant to be placed in fear of bodily injury or death.

Did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at Melissa Murray, hereafter styled the complainant, on or about the 1st day of July, 2021[,] knowingly engage in conduct that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury or death to the complainant, namely calling Victory Life Church or commenting regarding seeing Melissa Murray wearing a wedding ring, and the defendant's conduct would cause a reasonable person to fear bodily injury or death, and the defendant's conduct caused the complainant to be placed in fear of bodily injury or death.

occasion and pursuant to the same scheme and course of conduct that was directed specifically at Murray, knowingly engaged in conduct that Appellant knew or reasonably should have known that Murray would regard as threatening her with bodily injury or death, namely:

1. on or about September 6, 2020, going within 500 feet of Victory Life Church or violating a criminal trespass warning;

2. on or about July 1, 2021, calling Victory Life Church or commenting about seeing Murray wearing a wedding ring;

3. on or about July 18, 2021, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning;

4. on or about August 22, 2021, calling Victory Life Church, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning; and

---

. . . .

Did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at Melissa Murray, hereafter styled the complainant, on or about the 18th day of July, 2021[,] knowingly engage in conduct that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury or death to the complainant, namely violating a protective order, going within 500 feet of Victory Life Church or violating a criminal trespass warning, and the defendant's conduct would cause a reasonable person to fear bodily injury or death, and the defendant's conduct caused the complainant to be placed in fear of bodily injury or death.

Did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at Melissa Murray, hereafter styled the complainant, on or about the 22nd day of August, 2021[,] knowingly engage in conduct that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury or death to the complainant, namely calling Victory Life Church, violating a protective order, going within 500 feet of Victory Life Church or violating a criminal trespass warning, and the defendant's conduct would cause a reasonable person to fear bodily injury or death, and the defendant's conduct caused the complainant to be placed in fear of bodily injury or death.

Did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at Melissa Murray, hereafter styled the complainant, on or about the 25th day of August, 2021, knowingly engage in conduct that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury or death to the complainant, namely violating a protective order, going within 500 feet of Victory Life Church or violating a criminal trespass warning, and the defendant's conduct would cause a reasonable person to fear bodily injury or death, and the defendant's conduct caused the complainant to be placed in fear of bodily injury or death.

14

5. on or about August 25, 2021, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning.

Each paragraph further alleged that Appellant's conduct would cause a reasonable person to fear bodily injury or death and did cause Murray to be placed in fear of bodily injury or death.

The undisputed evidence shows that Appellant repeatedly called and visited the church between September 2020 and August 2021 with knowledge that such conduct was prohibited. Although he conceded that his actions caused Murray to be fearful, he nevertheless asserted that he was "just curious" when he called the church to ask whether Murray was married, and that Murray "was not [his] overriding purpose or [his] main focus" when he went to the church. Because the indictment clearly articulated the precise acts for which Appellant was charged and tried, there was no variance between the indictment and the proof at trial. *See Holguin v. State*, No. 11-20-00143-CR, 2022 WL 1040935, at *3 (Tex. App.—Eastland Apr. 7, 2022, pet. ref'd) (mem. op., not designated for publication).

### 2. *Legally Sufficient Evidence Supports the Conviction*

Appellant's insufficiency contention rests on the sole premise that the conduct alleged in the indictment was not "directed specifically" at Murray. Specifically, Appellant submits that because the criminal trespass warning was designed to protect the church, his violations were acts that were perpetrated against the church, not Murray.

That the church is the property protected by the criminal trespass warning is inconsequential, as Appellant was not indicted or tried for criminal trespass. Repeatedly appearing at a victim's place of employment or a location the victim is known to frequent, especially if direct or indirect contact is prohibited by a court order, can be sufficient to support a stalking conviction. *Bevers v. Mabry*, No. 05-22-00713-CV, 2024 WL 469550, at *9 (Tex. App.—Dallas Feb. 7, 2024, pet.

15

denied) (mem. op.); *see also Ploeger*, 189 S.W.3d at 808–09. Appellant's knowledge and intent are relevant considerations in determining whether his course of conduct was directed at Murray. *See Griswold*, 673 S.W.3d at 432–33 (appellant reasonably should have known that his decade-long barrage of letters, messages, and contacts would cause the victim to be placed in fear of bodily injury or death); *see also Davidson v. State*, No. 12-24-00360-CR, 2025 WL 2985037, at *9–11 (Tex. App.—Tyler Oct. 22, 2025, no pet. h.) (mem. op., not designated for publication) (there was sufficient evidence that appellant's course of conduct was directed at the victim, despite not having sent any communication directly to the victim). Further, proof of Appellant's culpable mental state invariably depends on circumstantial evidence and may be inferred from any facts that tend to prove its existence, including the acts, words, and conduct of the accused. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *McGowan v. State*, 375 S.W.3d 585, 591 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)).

Importantly, it was Appellant's obsession with Murray, which persisted until his arrest in 2021, that prompted the issuance of the criminal trespass warning in 2008. While Murray was employed as a worship leader, she notified church leadership that Appellant continuously bothered and pursued her even after she ignored him, hid, and had her friends and family tell him to leave her alone. After Appellant followed Murray in 2008, an associate pastor contacted the police to issue the criminal trespass warning. Roberts and his wife Kathy testified that the church requested the criminal trespass warning to support Murray because Appellant "[kept] doing it, no matter what anybody said . . . showing up where [Murray] was at all times when she asked [him] not to."

Contrary to the warnings that he received, Appellant chose to return to the one church where Murray had a longstanding and visible role. Particularly noteworthy

16

are the dates and times of Appellant's trespasses in 2020 and 2021, which occurred during worship services and a women's bible study, when it was highly likely that Murray would be present. In fact, she was present on at least two of those occasions. Appellant knew that Murray had been an integral part of the church for nearly two decades—as a member of the congregation since 2003, a full-time worship leader for nine years, and a volunteer on the worship team through 2021. It was thus reasonable for the jury to infer and conclude that Appellant's appearances at the church were calculated to coincide with Murray's presence there. His continuous attempts at unwanted contact with Murray, which Appellant facilitated by trespassing onto church property, is evidence from which a rational juror could have reasonably inferred and found that Appellant acted on each occasion pursuant to a scheme or course of conduct that was directed specifically at Murray. *See McGowan*, 375 S.W.3d at 590; *see also Ploeger*, 189 S.W.3d 808–09.

Furthermore, in the months preceding his arrest for the instant offense, Appellant expressed to several people his intent to return to the church, and he ultimately mentioned Murray in connection with that intent. Martin Venegas, Appellant's acquaintance, testified that Appellant expressed his intent to continue pursuing a relationship with Murray, and he showed Venegas the engagement ring that he intended to give Murray when he proposed. Venegas told him that it "didn't make sense" to put himself at risk "after all that time [and] after everything that [had] happened." But Appellant refused to "give up on his dream or what God had told him." He reasoned that "he [had] waited this long . . . had gone through all this suffering, trouble . . . why give up now?" Appellant denied at trial that he purchased the ring for Murray, and he claimed that he "may have been joking" when he told Venegas that the ring was for Murray. However, Appellant admitted that he "may have" contemplated giving it to Murray as another proposal.

17

Despite his insistence that his fixation on Murray ended in early 2020, Appellant explicitly stated to Valencia on at least two occasions that he trespassed onto church property under divine direction because "the Lord told [him] that [Murray was] supposed to be [his] wife." During each encounter, including on September 6, 2020, Appellant acknowledged that he was forbidden by law from being near Murray or entering the church's premises. Valencia "[didn't] have a good feeling" because it "[didn't] feel safe for [Murray], or potentially for anyone else." Appellant's decision to repeatedly violate the criminal trespass warning, the protective order, and to ignore verbal directives from many, including Murray, to leave her alone shows that his conduct was directed specifically at Murray rather than the church. *See McGowan*, 375 S.W.3d at 591; *Pomier v. State*, 326 S.W.3d 373, 381 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Considering "the combined and cumulative force of all admitted evidence and [the] reasonable inferences therefrom," a rational juror could have reasonably found that, in Appellant's mind, Murray and the church were effectively indistinguishable. *See Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App. 2017). Appellant's conduct in repeatedly calling the church and inquiring about Murray, and trespassing onto the church's premises when Murray would likely be there, was part of a common scheme or course of conduct that was directed specifically at Murray. Accordingly, we conclude that there was no variance between the charging instrument and the proof adduced at trial, and that the evidence is legally sufficient to sustain Appellant's conviction for stalking.

We overrule Appellant's third and fourth issues.

### III. *Charge Error*

Appellant asserts in his first issue that the trial court's charge permitted a less than unanimous verdict because the manner and means alleged were "*not* necessarily directed specifically at [Murray]." In his second issue, he again raises a general

18

complaint that the indictment and the charge failed to properly state that Appellant's conduct "had to be specifically directed at Murray."

A.  *Standard of Review*

Reviewing complaints of charge error is a two-step process. *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). First, we must determine whether error exists. *Id.* If there is none, our analysis ends. *See id.*; *Loza v. State*, 659 S.W.3d 491, 497 (Tex. App.—Eastland 2023, no pet.) (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)). Second, if there is error, we must decide whether the appellant was harmed and if the harm is sufficient to require reversal. *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013)); *Ybarra v. State*, 621 S.W.3d 371, 384 (Tex. App.—Eastland 2021, pet. ref'd). The applicable standard of review to be utilized for charge error depends on whether the claimed error was preserved. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020).

The purpose of the trial court's charge "is to inform the jury of the applicable law and guide them in its application to the case." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). Charge error stems from the denial of a defendant's right to have the trial court provide the jury with instructions that correctly set forth the "law applicable to the case." *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021) (quoting CRIM. PROC. art. 36.14 (West 2007)). Because the trial court is obligated to correctly instruct the jury on the law applicable to the case, it is ultimately responsible for the accuracy of its charge and the accompanying instructions. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (citing *Delgado*, 235 S.W.3d at 249). Therefore, when the charge is

inaccurate, the trial court errs, and the error is subject to the appropriate harm analysis. *See Bell*, 635 S.W.3d at 645.

B. *Jury Unanimity and the Trial Court's Charge*

In our analysis, we first consider whether the charge's application paragraph violated the unanimity requirement. *See Baker v. State*, No. 01-19-00694-CR, 2021 WL 785336, at *4–5 (Tex. App.—Houston [1st Dist.] Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication). The application paragraph provided in relevant part:

> You must determine whether the state has proved, beyond a reasonable doubt, four elements. The elements are that—
>
> 1. [Appellant], in Brown County, on more than one occasion knowingly engaged in conduct, specifically
>
>    a. on or about the 6th day of September, 2020, going within 500 feet of Victory Life Church or violating a criminal trespass warning;
>
>    b. on or about the 1st day of July, 2021, calling Victory Life Church or commenting regarding seeing [Murray] wearing a wedding ring;
>
>    c. on or about the 18th day of July, 2021, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning;
>
>    d. on or about the 22nd day of August, 2021, calling Victory Life Church, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning;
>
>    e. on or about the 25th day of August, 2021, violating a protective order, going within 500 feet of Victory Life Church, or violating a criminal trespass warning.
>
> 2. the conduct was pursuant to the same scheme or course of conduct;
>
> 3. the scheme or course of conduct was directed specifically at [Murray], another person; and
>
> 4. the conduct on each occasion—

a. was conduct the defendant knew or reasonably should have known that [Murray] would regard as threatening bodily injury or death upon [Murray];

b. was conduct that did cause [Murray] to be in fear of bodily injury or death upon [her]; and

c. was conduct that would cause a reasonable person to fear bodily injury or death upon [Murray].

You must all agree on elements 1 through 4 listed above.

You need not all agree on whether the [S]tate has proved 1.a, 1.b, 1.c, 1.d, or 1.e, but you must all agree that the [S]tate has proved [that Appellant] engaged in conduct meeting the descriptions on more than one occasion during the specified period.

Texas law requires that a jury reach a unanimous verdict about the specific crime with which the defendant has been charged and committed. TEX. CONST. art. V, § 13; *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011) (citing *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008)). Allowing a jury to choose from several separate acts, each of which is a violation of a specific statute, without requiring the jury to agree on which specific act was committed by the defendant, violates the unanimity requirement. *Ngo*, 175 S.W.3d at 747–48. However, the unanimity requirement is not violated when the jury is instructed on alternative theories of committing the same offense, as opposed to instructing the jury on two separate offenses that involve separate incidents. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). Thus, "[i]f an indictment alleges differing means of committing an offense, a trial court does not err by charging the jury in the disjunctive." *Jones v. State*, 184 S.W.3d 915, 922 n.6 (Tex. App.—Austin 2006, no pet.) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

"[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." *Francis v. State*, 36 S.W.3d 121, 124 (Tex. Crim. App. 2000). When, as here, the factfinder

21

returns a general guilty verdict based on an indictment that charged alternative theories of committing the same offense, the verdict stands if the evidence supports any of the theories charged. *Kitchens*, 823 S.W.2d at 258.

As discussed, the State alleged and presented five different ways in which Appellant committed the offense of stalking between September 2020 and August 2021. *See Floyd v. State*, 714 S.W.3d 9, 15 (Tex. Crim. App. 2024); *Baker v. State*, No. 01-19-00694-CR, 2021 WL 785336, at *4–5 (Tex. App.—Houston [1st Dist.] Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication). The State was permitted to plead alternative manners and means of committing this offense. *See Floyd*, 714 S.W.3d at 15; *Hayes*, 2025 WL 2988740, at *5. Because the offense could be committed in various ways, it was not necessary for the jurors to unanimously agree upon the mode of commission; as such, it was appropriate for the jury to return a general verdict. *Lafaitt v. State*, No. 12-18-00351-CR, 2020 WL 827136, at *7 (Tex. App.—Tyler Feb. 19, 2020, no pet.) (mem. op., not designated for publication); *see also Alfaro v. State*, No. 14-18-00923-CR, 2020 WL 548219, at *5 (Tex. App.—Houston [14th Dist.] Feb. 4, 2020, no pet.) (mem. op., not designated for publication) (it is not necessary that the jurors agree on the same incidents of stalking and "[i]t is a correct statement of the law that the jury need not unanimously agree on alternate modes or means of committing an offense"). Having determined that the evidence is legally sufficient to support Appellant's conviction under all five incidents as alleged in the indictment, the unanimity requirement is satisfied in this case. *See Lafaitt*, 2020 WL 827136, at *7. We therefore conclude that there was no charge error, as Appellant suggests.

Accordingly, we overrule Appellant's first issue.

C. *No Other Charge Error*

In Appellant's second issue, he argues that the charge "allowed [the] jurors to base a decision of guilt on conduct against a third party[7] not named in the actual indictment." But as we have said, the charge required that Appellant's conduct be specifically directed at Murray. Accordingly, and for the same reasons that we have overruled Appellant's first issue, we overrule his second issue.

IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

December 18, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[7]The third party to which Appellant refers is the church.

23